708 So.2d 851 (1998)
STATE of Louisiana
v.
Ronald A. SCHEXNAYDER.
No. 97 KA 0729.
Court of Appeal of Louisiana, First Circuit.
April 8, 1998.
*852 Dana K. Larpenteur, Assistant District Attorney, Plaquemine, for AppelleeState.
C. Jerome D'Aquila, New Roads, for Defendant-AppellantRonald A. Schexnayder.
Before CARTER and FITZSIMMONS, JJ., and CHIASSON[1], J. Pro Tem.
FITZSIMMONS, Judge.
The defendant, Ronald A. Schexnayder, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty and, after trial by jury, was found guilty as charged. The defendant subsequently was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He has appealed, urging eight assignments of error.

FACTS
On the evening of November 14, 1994, in Iberville Parish, Louisiana, in front of Jackson's Store, the defendant fired five shots and hit the victim, Donovan Pooler, three times. The shooting occurred after several confrontations between the defendant and the victim over a bicycle. The victim died from the gunshot wounds. The defendant subsequently turned himself in to law enforcement officials and admitted shooting the victim.
According to statements given by the defendant to law enforcement officials, the defendant and the victim had three confrontations the day of the shooting. The defendant claimed that, at the first confrontation, the victim approached him and cursed at him because he wanted to use the bicycle the defendant was riding. The bicycle belonged to the defendant's cousin. The defendant left the scene and returned home. He then left his home to bring the bicycle to his cousin, but his cousin told him that he did not need the bicycle. The defendant then stopped in front of Jackson's store where he and the victim exchanged more curse words regarding the use of the bicycle and, as the defendant was leaving, the victim picked up rocks from the parking area and threw them at the defendant. The defendant indicated that the rocks hit him. The defendant returned home and retrieved a gun and then returned to the store area with the gun in his hand. In his statement, the defendant stated that he returned to the store because he did not like how the victim had treated him. The defendant stated that, when he arrived at the store, the victim cursed at him, and asked if defendant was going to shoot *853 him. The defendant fired one shot and missed the victim. Defendant then fired more shots, some of which hit the victim. The defendant claimed that he was concerned for his safety, but did not indicate that he thought the victim had a weapon.
Dr. James Freeman, who conducted the autopsy of the victim, testified at trial that the victim sustained three gunshot wounds. The wounds were to the head, chest, and penis. The cause of death was the gunshot wound to the head. According to Dr. Freeman, the victim must have been either sitting down or bending over when shot in the head, as the trajectory of the bullet was in a downward manner. Dr. Freeman did state that the bullet could have traveled in a downward manner if the defendant was much taller than the victim. However, Dr. Freeman concluded that the defendant would have to have been thirteen feet tall. According to Dr. Freeman, the shots to the chest and penis were from the front, but the shot to the head was from the rear. Dr. Freeman concluded that either the victim was not facing the defendant when shot in the head, or the victim had his head turned away from the defendant. According to Dr. Freeman, the victim had traces of marijuana and cocaine in his bloodstream. However, Dr. Freeman testified that the amount of marijuana was considered to be very low and any behavioral effects from the cocaine would have been gone within two hours of its use.
Ferrando Smith was at the scene when the shooting occurred. Smith knew the defendant and the victim, and thought that they were friends. Smith was on his way home from basketball practice on the evening of November 14th, when he saw the victim and Donnie Brown in front of Jackson's store. He stopped to talk with them. They talked about the girls that they were going to call. According to Smith, while they were talking, the defendant approached the victim and asked him why he yelled at the defendant. The defendant and the victim began to argue about the bicycle that the defendant was riding. The victim grabbed the handlebars of the bicycle. When the victim let go of the handlebars, defendant rode off but stated that he would be back. The victim picked up some rocks and threw them at the defendant. Smith did not see any rocks hit the defendant.
Approximately fifteen minutes later, Smith, Brown, and the victim were still talking when the defendant returned to the scene on the bicycle. According to Smith, the defendant stopped about five feet from the victim, pulled out a gun, stated, "What that was you said?", and started shooting. Smith stated that the victim did not move toward the defendant, but only turned around because his back had been toward the defendant. Smith did not see the victim reach toward his pocket, nor did he see the defendant shoot two warning shots into the ground. Smith did not see any drugs; he did not see the victim with a gun.
Donnie Brown was also at the scene when the shooting occurred. Brown knew the defendant and the victim. He also thought that they were friends. Brown talked with the victim and Smith in front of Jackson's store and was informed that the defendant and the victim had had an argument earlier that same day. He was present at the store when the defendant and the victim argued over the bicycle. Brown saw the victim throw rocks at the defendant, as the defendant rode away. He did not know if any rocks hit the defendant. According to Brown, there was no physical contact between the victim and the defendant, other than the victim grabbing the handlebars of the bicycle the defendant was riding. As the defendant left the scene, he stated that he would be back. Brown thought the defendant and the victim were "clowning."
According to Brown, the defendant returned to the scene about fifteen minutes later. The victim had his back toward the defendant, and Brown did not think that the victim saw the defendant approach. The defendant asked the victim, "What that was [you] said." The defendant, who had a gun in his hand, and the victim began arguing. The victim was standing still. According to Brown, the defendant shot the victim one time. The victim grabbed his chest. Brown ran off after the first shot to call the police, but he heard more gunshots. Brown did not see the victim make a move toward his pocket *854 before being shot. He thought the victim was wearing pants that did not have pockets. According to Brown, the defendant pointed the gun at the victim before firing the first shot. Brown thought the victim was standing still, and was three or four feet away from the defendant when the defendant fired the first shot. Brown did not see the defendant fire two warning shots into the ground, or hear the defendant tell the victim to stop. According to Brown, the victim did not have a weapon, and he did not see the victim using any drugs.
The defendant testified at trial that at approximately 3:30 p.m. on November 14th, he saw the victim standing on a corner with a group of men. He did not say anything to the victim. He later saw the victim at a barbecue. He claimed he saw the victim smoking a marijuana cigarette laced with cocaine. The defendant testified that he made the assumption, as to what the victim was smoking, because defendant saw the victim earlier in his car and presumed he was rolling a marijuana cigarette. He spoke to the victim at the barbecue. According to the defendant, everyone left the barbecue at nightfall. The defendant left on his cousin's bicycle. However, the victim cursed and indicated that he wanted to fight because he wanted to use the bicycle. The defendant went home to change clothes. His cousin called him and said that he wanted the bicycle. The defendant left home to take the bicycle to his cousin. However, when he saw his cousin, the cousin indicated that he no longer needed the bicycle. The defendant went to give the bicycle to the victim. However, because the victim cursed at him, grabbed the bicycle, and pushed him, the defendant left. As the defendant was leaving, the victim threw some rocks at him that hit him. According to the defendant, he was scared of the victim and thought that he was going to hurt the defendant. The victim appeared drunk and high. The defendant claimed that he had seen the victim act this way before, and he did not think he could protect himself.
The defendant returned to his house and stayed there for approximately ten minutes. He thought the victim would try to take the bicycle from defendant's house, so he decided to take the bicycle somewhere else. According to the defendant, he grabbed a gun for protection, and returned to the store area where the victim was standing. The victim approached him and asked if he had a gun. The defendant responded that he did not have a gun, but the defendant believed that the victim saw the gun. The defendant told the victim not to come any closer and fired warning shots into the ground. The victim came toward him, and pulled something from the victim's pocket. The defendant fired three more shots, but aimed downward. He only remembered one shot hitting the victim. The defendant was scared, so he went home and called the police. He claimed that he intended only to scare the victim and thought the victim was trying to harm him. The defendant stated that when he grabbed the gun, he did not know if it worked or if it was loaded. The defendant thought the shooting occurred approximately two hours after the barbecue.
James Cox of the Iberville Parish Sheriff's Office investigated the shooting and secured the crime scene. He was the first officer at the scene. Cox did not find any weapons on the victim or in the area. He did find crack cocaine and a pager near the victim's body, but was unable to determine to whom they belonged.

ASSIGNMENTS OF ERROR NUMBERS ONESEVEN
In his first seven assignments of error, the defendant contends that the trial court erred in ruling that there was no overt act or hostile demonstration on the part of the victim in this case, thus prohibiting the introduction of evidence regarding the character of the victim. In his brief to this court, the defendant argues that the victim's aggressive behavior toward him and the throwing of limestone at him by the victim prior to the shooting constituted an overt act or hostile demonstration sufficient to allow the introduction of character evidence of the victim. Thus, the court should have allowed him to introduce evidence of the victim's dangerous character and violent tendencies. He contends that the jury had the right to *855 hear about the reputation of the victim, who was known to carry a weapon and known for his prior violent behavior. He contends that he offered sufficient evidence of overt acts toward him, by the victim, to allow the introduction of the victim's dangerous character.
The foundation for admissibility of such evidence is La.Code Evid. art. 404:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
* * * * * *
(2) Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible....
* * * * * *
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith....
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible;....
Evidence of the dangerous character of the victim is admissible only if the accused first produces evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against the accused of such character that would have created, in the mind of a reasonable person, a belief that he was in immediate danger of losing his life or suffering great bodily harm. Once evidence of an overt act by the victim is established, evidence of threats and of the victim's dangerous character is admissible for two distinct purposes: (1) to show the defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict. State v. Ducre, 596 So.2d 1372, 1378-79 (La.App. 1st Cir.), writ denied, 600 So.2d 637 (La.1992).
Evidence of an overt act has been interpreted as "appreciable evidence" in the record relevantly tending to establish the overt act. State v. Demery, 28,396 p. 4 (La. App.2d Cir. 8/21/96), 679 So.2d 518, 521, writ denied, 96-2346 (La.2/7/97), 688 So.2d 497. Once the defense has introduced appreciable evidence relevantly tending to establish the overt act, the trial court cannot exercise its discretion to infringe on the factdetermination function of the jury by disbelieving this defense testimony and deny the accused a defense permitted him by law. State v. Lee, 331 So.2d 455, 459 (La.1975).
In the instant case, the defendant points to particular parts of his own testimony that allegedly constituted an overt act by the victim: (1) that the victim moved toward him and (2) reached into his pocket while cursing. While the testimony at trial revealed that the defendant and the victim had argued several times prior to the shooting, and were arguing at the time of the shooting, there was no evidence, other than the defendant's testimony, that the victim made any action that could have been interpreted as an overt act. The other two eyewitnesses to the shooting did not see the victim make a move toward his pocket, nor did they see the victim move toward the defendant. The witnesses did not testify that the victim was acting irrationally or that he was armed. Additionally, at one point in his testimony, the defendant acknowledged that the victim only made a move toward his pocket, after the defendant fired two warning shots. Furthermore, no weapon was found on or near the victim.
We note that, under different circumstances, the evidence of bad character should be admissible: a continually harassed, injured, or stalked innocent individual might re-act to a tormentor, without waiting for yet another overt act. After the connected series *856 of threats of harm or injuries, there is no logic in demanding yet another overt act with the tormentor before any evidence of dangerous character can be admitted. If so, "hostile demonstration" or "overt act" become limited in time to immediacy. Such a holding asks too much of a frayed innocent human being. We should allow a state of mind exception for the defendant so that the defendant can submit to the fact-finder the basis for the reaction. If that evidence is precluded from the jury's mind, the defendant in such a case cannot receive a fair hearing. The federal rule, on which Louisiana Evidence Rule 404 is patterned, does not contain the "overt act" requirement. The omission protects the defendant's absolute right to present a true defense. This is a deliberate omission. A defendant involved in a stalking, or continuing pattern of threats case, cannot present a full defense, unless allowed to explain the basis for the re-action. We must let the jury decide: it is their constitutional duty. Thus, the jury is the appropriate one to determine if the re-action was reasonable and justifiable, under the circumstances. In continuing threat of harm cases, the jury can only make a just decision if given all the evidence.
However, it is clear from the trial testimony here that the defendant was not the focal point of a planned continuing series of confrontations and threats of harm instigated by the victim. Two pivotal facts are present: the defendant's return to the scene, after he was relatively safe at home; and the defendant's initiation of a weapon into the scene.
Considering all of the above, we find that the trial court correctly concluded that the defense failed to establish an overt act by the victim that would create, in the mind of a reasonable person, a belief that he was in imminent danger of losing his life or suffering great bodily harm. See State v. Ducre, 596 So.2d at 1380. Accordingly, the trial court correctly prevented the defense from introducing any evidence of the victim's dangerous character. These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
In assignment of error number eight, the defendant contends that the verdict of the jury was contrary to the law and evidence. In his brief to this court, the defendant argues that the evidence adduced at trial was not sufficient to establish his guilt. The defendant does not deny shooting the victim; rather, he questions whether he intended the result that occurred. He claims that he and the victim were long-time acquaintances and there was no "bad blood" between them. He denied threatening the victim, and asserted that he armed himself with the gun for his own protection. He claimed that he was afraid of the victim, and, as the victim approached him, he initially fired into the ground. The defendant contends that no direct evidence of his specific intent was presented, and any circumstantial evidence was insufficient. Thus, he claims an essential element of the crime was not proven. Thus, the jury erred in finding him guilty of second degree murder.
The standard of review for the sufficiency of evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Powell, 94-1390, p. 7 (La. App. 1st Cir. 10/6/95), 671 So.2d 493, 498, writ denied, 95-2710 (La.2/9/96), 667 So.2d 529. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
The applicable definition of second degree murder in this case is the killing of a *857 human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by the defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Huls, 95-0541, pp. 25-26 (La.App. 1st Cir. 5/29/96), 676 So.2d 160, 177, writ denied, 96-1734 (La.1/6/97), 685 So.2d 126.
A specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range. See La. R.S. 14:30.1(A)(1); State v. Powell, 94-1390 at p. 12, 671 So.2d at 500. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 472 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
The evidence presented in the instant case indicates that the defendant shot his gun at the victim five times at a distance of three to four feet. Although the defendant claimed that the first two shots were fired into the ground, the defendant shot the victim at least three times with the fatal shot to the rear of the victim's head traveling in a downward direction as if the defendant shot him when he was already down. One eyewitness testified that the defendant pointed the gun at the victim as he shot.
We reject the defendant's argument and find that a specific intent to kill or inflict great bodily harm can be inferred from the circumstances of the shooting. After a careful review of the entire record, we believe that a rational trier of fact, viewing all of the evidence, both direct and circumstantial, as favorable to the prosecution as any rational fact finder can, could have concluded beyond a reasonable doubt that the defendant was guilty of second degree murder. This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.