734 So.2d 1232 (1999)
STATE of Louisiana
v.
Joseph BROOKS.
No. 98 KA 1151.
Court of Appeal of Louisiana, First Circuit.
April 15, 1999.
*1233 Doug Moreau, District Attorney, Dana Cummings, Assistant District Attorney, Baton Rouge, for Appellee State of Louisiana.
Jesse B. Hearin, III, Baton Rouge, for Defendant-Appellant Joseph Brooks.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
GUIDRY, J.
Defendant, Joseph Brooks[1] was charged by indictment with second degree murder of Michael Rowe (Rowe) in violation of La. R.S. 14:30.1. He entered a plea of not guilty. The trial judge denied defendant's motion in limine to allow character evidence of Rowe, and granted the State's motion to exclude expert testimony on the use of deadly force. A jury found defendant guilty of manslaughter. La. R.S. 14:31. Defendant filed a motion for new trial, which was denied without a contradictory hearing. He was sentenced to twenty-five years at hard labor. Defendant filed a motion to reconsider sentence, which was denied. Defendant now appeals, assigning the following errors: (1) the trial judge erred in excluding evidence of Rowe's alleged reputation for violence and Rowe's prior threats toward defendant; (2) the trial judge erred in excluding Dr. Wade Schindler's testimony on the use of deadly force; (3) prejudicial error occurred from the State's failure to notify defendant prior to trial that the coroner modified his conclusions regarding the autopsy; (4) the trial judge erred in sentencing defendant to twenty-five years at hard labor; (5) combined errors deprived defendant of a fair trial; and (6) the trial court erred in denying defendant's motion for new trial without a contradictory hearing.

FACTS
On December 15, 1996, defendant attended a dance held at the American Legion Hall. When the dance ended, he walked out of the building and engaged in conversation with his friend, Tammy Woodard (Woodard). Rowe and Gregory Robertson (Robertson) approached them. The events that followed concluded with defendant pulling out his gun from his truck and firing shots. Rowe was struck twice, suffering a fatal gunshot wound to his head. He died within minutes as a result of severed blood vessels. Rowe's blood alcohol level was .17 grams percent, indicative of legal intoxication. Nine shell casings were found at the scene. The closest shell casing was approximately thirty feet from the body. The body was located approximately two feet from the back bumper of a van parked in the parking lot. The van had bullet impacts and its rear window was shattered. Other passing vehicles were struck as well. Defendant and Woodard left the area following the incident. Woodard subsequently provided the police with information regarding defendant's identity. Defendant went to the police station and turned himself in. Defendant does not deny he shot and killed Rowe. Instead, he argues his actions were justified because he fired at Rowe in self-defense and in defense of another.

ASSIGNMENT OF ERROR NUMBER 1: VICTIM'S CHARACTER AND VICTIM'S PRIOR THREATS
Defendant filed a motion in limine for the purpose of allowing evidence of Rowe's allegedly abusive behavior toward defendant, including alleged death threats, and other actions designed to provoke defendant. *1234 Defendant urged that the evidence was essential to the claim and that he acted in self-defense. In particular, he asserted Rowe was the aggressor, and the acts and threats were relevant to defendant's state of mind as being reasonably apprehensive of danger from Rowe. He further alleged that several overt or hostile acts occurred at the time of the shooting or immediately preceding the shooting.
At the pretrial hearing on the motion in limine, defense counsel proffered, inter alia, the following: Defense Proffered Exhibit No. (3), a probable cause affidavit for Rowe's arrest signed June 29, 1996; Defense Proffered Exhibit No. (4), an arrest report of Rowe showing charges of felon in possession of a firearm, contempt of city court, and speeding as well as a notice of arraignment for a traffic violation; Defense Proffered Exhibit No. (8), a court order for Rowe's arrest for illegal carrying of a weapon. Additionally, after the hearing, but prior to trial, defense counsel stated he would proffer[2] the testimony of Malcolm Moore (Moore), Reginald Johnson, Clay Alexander, defendant, Robertson, and various unnamed parties involved in the investigation to show violent propensities and violent reputation of Rowe, Rowe's criminal record, Rowe's prior threats to defendant, defendant's knowledge of Rowe's reputation for violence, and a prior shooting incident in Port Hudson involving Rowe in which Robertson was a witness. We note the trial judge did not allow defendant to actually proffer testimony; he restricted defendant from fully presenting the substance of the proffered evidence. At the conclusion of the hearing, the trial judge denied the motion in limine without reasons.
On appeal, defendant argues the trial judge erred in preventing him from introducing evidence of his awareness of Rowe's reputation for violence in the community, and to have other witnesses corroborate his testimony on this subject. In brief, defendant describes Rowe as a career criminal who had been charged with illegal possession of a firearm as a convicted felon. He also refers to an incident involving Rowe and Robertson in which no criminal charges arose, but in which Rowe was shot in the neck, presumably the Port Hudson incident. Further, he notes that all members of the community knew Rowe was someone who carried out his threats. He argues that the excluded evidence relates to state of mind, reasonableness of defendant's fear, and who was the aggressor.
The testimony at the pretrial hearing on the motion in limine revealed the following. Defendant testified[3] that while at the dance, he experienced no difficulties, but believed that Rowe, who was also present, tried to provoke him. Rowe gave defendant a "strange look" as Rowe pulled someone, who had been speaking with defendant, away from defendant. Later, while leaving the club, defendant encountered Rowe once again. Defendant was speaking to his friend, Woodard, as Rowe and Robertson walked by. The two men appeared to be going toward a vehicle in the parking lot. However, Rowe and Robertson changed direction and began walking toward defendant and Woodard. Defendant was "alarmed" at their approach, and felt trouble was imminent.
Rowe walked behind Woodard, grabbed her pants quickly and forcefully, lifted her off the ground, and said, "My boy wants you." Woodard told Rowe to cease, and Rowe released Woodard. Defendant viewed Rowe's actions as a "strong-arm attempt," describing Rowe as six feet, one inch in height and weighing approximately 200 pounds, an observation consistent with the autopsy report. Woodard was alarmed and frightened. Rowe looked at *1235 defendant and defendant asked Rowe why he was bothering them. Rowe replied, "N_____[4] stay out of it." Defendant did not consider walking away, since he felt Woodard would be in danger. However, Woodard encouraged him to leave, which prevented the argument from becoming heated. Defendant realized an earlier injury to his shoulder would place him at a disadvantage should a fight develop. As he and Woodard walked away into the parking lot, Rowe called defendant a "Pussy Ass N_____." Rowe then said, "N_____, we can handle this now," a statement that defendant interpreted to mean "war." That statement, coupled with defendant's knowledge of Rowe's alleged propensity for violence and for carrying a gun, led defendant to believe Rowe had a firearm although he never saw one.
Defendant testified that he did not know whether Rowe had a gun, although he suspected that he did have one; he explained that it was dark in the area. He did not see anything in the hands of any of the men that he thought was a weapon or a gun. Rowe was approximately fifteen to twenty feet behind defendant when he made the comment. Based on Rowe's past behavior, the comment meant that Rowe was going to do something to defendant using a gun or a knife. Upon uttering this statement, Rowe and Robertson, now joined by George Tate (Tate), moved quickly toward defendant. This was the last statement made by Rowe. Defendant and Woodard walked toward defendant's truck with the men quickly following them at a distance of fourteen to fifteen feet.
When defendant was two feet from the truck, he opened his security locks. Defendant was positioned near the driver's side of the truck, while Woodard was located near the passenger's side of the truck. As defendant leaned into his truck, he looked through the window and saw that the three men continued to advance. He did not get into his truck to leave because the men were too close, approximately twelve to fourteen feet away from him, and he felt he would not have survived a bullet at that distance. Defendant grabbed his gun, which was located under the seat, and stepped outside the vehicle. By this time, Rowe was in front of defendant, proceeding directly toward him. Defendant had no time to say anything to Rowe, and instead fired two or three times toward the ground to Rowe's left in order to force the men to depart.
At the time he fired the shots, Rowe was approximately twelve to fifteen feet from defendant. During cross-examination, he indicated Rowe was twelve to fourteen feet from him. Defendant was one to two steps away from the driver's side of his truck when he started shooting. All three men were in close proximity to each other, with Rowe being the first in line. The two other males turned and ran. Rowe moved approximately two feet to his (Rowe's) left, appearing to attempt to get around defendant. Defendant turned toward Rowe and he and Rowe stopped; they looked directly at each other. Defendant's gun was now "in the down position." At this point, Rowe was approximately ten to twelve feet from defendant. Defendant looked down at his gun to see if it was empty. The gun still had bullets. As he looked down, Rowe lunged or ran quickly toward him, while raising one of his hands. Defendant did not know where Rowe's hand was located. He thought Rowe was going to shoot him or attack him. He was concerned for the safety of himself and Woodard. When Rowe lunged, defendant leaned forward, and raised the gun. Defendant panicked. He did not recall actually discharging the weapon, but could hear gunshots on an unconscious level. Defendant did not recall how far Rowe was from him at the time he fired the second time; however, he did not think Rowe had *1236 reached him. Defendant did not know the length of pause between the two rounds of gunfire. Rowe turned and ran.
Defendant felt his life was being threatened when the men did not retreat. After firing warning shots, defendant felt he could not let Rowe get any closer to him because Rowe could easily disarm him because of his shoulder injury, defendant believed Rowe could then shoot him or beat him to death with his (defendant's) weapon. Defendant was concerned about the approach of the three men and did not want to risk a close confrontation.
Prior to driving away, defendant saw one of the men ask Rowe, who was still standing, if he had been hit. Defendant did not hear the answer and did not know at this time that Rowe had been shot.
Woodard's testimony was similar to defendant's account. She was only aware of two individuals who were following them. She testified defendant and Rowe argued, however, she could not recall the exact words spoken by Rowe to defendant. She construed the words to be aggressive and threatening. As a result, she was concerned for her safety. At trial, Woodard testified Rowe argued more aggressively than defendant. She also explained the argument continued as they walked, with the men getting closer to them. She did not see anyone with a weapon.
Robertson and Tate testified at the pretrial hearing and at trial that Rowe and defendant argued, but they denied following defendant. Instead, they testified they were walking toward Robertson's parked vehicle at the close of the dance. Robertson, who was walking behind Rowe, heard two shots, a brief pause, and then more shots. Tate, who was also behind Rowe at the time of the shooting, testified at the pretrial hearing that Rowe told defendant that defendant could handle his business at that time. At trial, Tate elaborated that Rowe's hands were in the air when he made the statement. Tate denied Rowe threatened defendant's life, but explained he felt Rowe's response of raising his hands caused the shooting to take place.
At the conclusion of the pretrial hearing, defense counsel argued that the overt acts consisted of Rowe's threatening actions, his pursuit of defendant and Woodard, as well as Rowe's lunging toward defendant after warning shots had been fired. The trial judge denied the motion and stated he would disallow character evidence of Rowe as well as the prior alleged threats made by Rowe.
In State v. Edwards, 420 So.2d 663, 669 (La.1982) (citing State v. Green, 335 So.2d 430, 433 (La.1976) and State v. Lee, 331 So.2d 455, 460 (La.1975)), the Louisiana Supreme Court held:
Evidence of the victim's dangerous character or threats against the accused supports a plea of self-defense because it is relevant to show that the victim was the aggressor and to show that defendant's apprehension of danger was reasonable.
Admissibility of such evidence is governed by La.Code Evid. art. 404, which provides, in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
. . . .
(2) Character of victim. (a) Except as provided in Article 412 [regarding victim's past sexual behavior in sexual assault cases], evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused *1237 pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible[.]
. . . .
B.(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible. (emphasis added).
In State v. Schexnayder, 97-0729, pp. 8-9 (La.App. 1st Cir.4/8/98), 708 So.2d 851, 855, writ denied, 98-1665 (La.10/30/98), 723 So.2d 978, we explained:
Evidence of the dangerous character of the victim is admissible only if the accused first produces evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against the accused of such character that would have created, in the mind of a reasonable person, a belief that he was in immediate danger of losing his life or suffering great bodily harm. Once evidence of an overt act by the victim is established, evidence of threats and of the victim's dangerous character is admissible for two distinct purposes: (1) to show the defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict. State v. Ducre, 596 So.2d 1372, 1378-79 (La.App. 1st Cir.), writ denied, 600 So.2d 637 (La.1992).
Evidence of an overt act has been interpreted as "appreciable evidence" in the record relevantly tending to establish the overt act. State v. Demery, 28,396 p. 4 (La.App.2d Cir.8/21/96), 679 So.2d 518, 521, writ denied, 96-2346 (La.2/7/97), 688 So.2d 497. Once the defense has introduced appreciable evidence relevantly tending to establish the overt act, the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and deny the accused a defense permitted him by law. State v. Lee, 331 So.2d 455, 459 (La.1975).
In State v. Collins, 432 So.2d 369, 371 (La.App. 1st Cir.1983) (citing State v. Cavalier, 421 So.2d 892, 894 (La.1982)), we stated:
An overt act is any act of the victim which manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm. The overt act by the victim must have been made against the defendant at the time of the incident.
Although the trial judge gave no reasons for denying the motion, he evidently concluded there was no appreciable evidence of a hostile demonstration or overt act by Rowe at the time of the offense which manifested in the mind of a reasonable *1238 person Rowe's present intention on his part to kill or do great bodily harm. Collins, 432 So.2d at 371. Defendant argues the trial judge usurped the jury's fact-finding function. We agree. It is apparent that in reaching this conclusion, the trial judge weighed the inconsistent testimony of the witnesses, rather than allowing the jury to decide the weight to be accorded to the evidence. See Lee, 331 So.2d at 459 (wherein the trial court committed error in disbelieving defense testimony); See also State v. Washington, 30,043, p. 10 (La.App. 2nd Cir.1/23/98), 706 So.2d 203, 209-210 (wherein the court held that despite innumerable discrepancies in the testimony of witnesses, once the threshold of appreciable evidence was met, the weight to be accorded such evidence was for the jury to decide).
The trial judge apparently found Tate and Robertson to be more credible than the defense witnesses. Although both described an argument, they denied following defendant and Woodard. Considering the standard enunciated in Lee, Collins, and Washington, we find the threshold of appreciable evidence to establish an overt act by Rowe which would manifest, in the mind of a reasonable person, a present intention on his part to kill or do great bodily harm, was met by defense testimony. See Lee, 331 So.2d at 459; Collins, 432 So.2d at 371; Washington, 30,043 at 10, 706 So.2d at 209-210.
Defense testimony shows that Rowe, Robertson, and Tate pursued defendant and Woodard while Rowe continued to argue with defendant, threatening "war" was imminent. The words spoken by Rowe were aggressive and threatening, causing defendant and Woodard to fear for their safety. The testimony further shows that after threatening defendant, and despite warning shots, Rowe lunged toward defendant while raising one of his hands. Defendant explained that although he suspected Rowe had a gun, he was unable to see a gun in Rowe's hand because the area was dark. We also note that at trial Tate, a State's witness, testified Rowe told defendant, "You can handle your business now," while Rowe's hands were in the air. Tate felt Rowe's response of raising his hands caused the shooting to take place. Furthermore, Robertson heard a pause after two shots were fired, suggesting these were warning shots.
In State v. Jackson, 419 So.2d 425, 429 (La.1981) (on rehearing), the court, after considering similar factual circumstances, found the requisite showing of an overt act, and concluded these provided a reasonable belief the victim had a weapon behind her back. In that case, the victim, while cursing at defendant, advanced toward defendant with her right hand behind her back after receiving a warning shot. The victim created a disturbance and threatened to harm family members. Defendant left the gathering to meet her ride and was approached in a hostile and threatening manner by the victim. Defendant begged the victim to stop the approach, but the victim continued approaching, with her right hand behind her back, and using menacing words and gestures. Defendant fired a warning shot and then shot the victim in the leg. The victim paused, and then sprang at defendant, who was now backed up against a car. Defendant reacted and fired a fatal shot. As in the instant case, no weapon was discovered on or near the victim. Jackson, 419 So.2d at 427-430.
The State argues Schexnayder, supra, and State v. Ducre, 596 So.2d 1372 (La. App. 1st Cir.), writ denied, 600 So.2d 637 (La.1992) are applicable. We disagree. In Schexnayder, defendant argued that the victim's moving toward defendant, and reaching into his pocket while cursing, met the test for establishing an overt act. We concluded the defense failed to establish an overt act. Schexnayder, 97-0729 at 9-10, 708 So.2d at 855-856. In Ducre, defendant argued an overt act was established by the fact that the victim was armed with a gun and was the verbal aggressor in the argument. We found no appreciable evidence *1239 of an overt act when the victim approached defendant while simply making hand gestures, even assuming the victim had a gun in his pocket. Ducre, 596 So.2d at 1379-1380.
In contrast to Schexnayder and Ducre, defense testimony herein shows that Rowe, accompanied by three men, actively pursued defendant and Woodard while Rowe threatened defendant with "war." Additionally, Rowe herein lunged at defendant, with an upraised hand, after warning shots were fired.
This aspect of the assigned error has merit.
We now examine the nature of the evidence defendant sought to introduce. Once appreciable evidence of a hostile demonstration or overt act on the part of the victim at the time of the offense has been shown, then character evidence of the victim and prior threats is admissible. La. Code Evid. art. 404. Proof of character evidence is subject to the provisions of La.Code Evid. art. 405 which provides, in pertinent part:
A. Reputation. [I]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation only. On cross-examination of the character witness, inquiry is allowable into relevant specific instances of conduct.
. . . .
C. Foundation. Before a person may be permitted to testify to the reputation of another person, a foundation must be established that the witness is familiar with that reputation.
The record reflects defendant was initially precluded from testifying to an incident, allegedly occurring at a supper approximately one to one-and-one-half months prior to the shooting, wherein Rowe threatened defendant. However, defendant was allowed to testify at trial to specific details regarding that incident and the alleged threats, having vaguely referred to the event during direct examination. Additionally, defendant also testified at trial regarding Rowe's alleged bad character and propensity for violence. However, the trial judge disallowed further character evidence of Rowe. Although the trial court denied defendant's motion to allow the evidence, the record shows that defendant was allowed to present some testimony of Rowe's alleged bad character and his prior alleged threat to defendant.
Regarding Rowe's character, defendant testified at trial to general, nonspecific allegations in this regard. He testified he perceived Rowe to be living a "thug life," and because of prior statements and prior dealings with Rowe, defendant felt that Rowe was going to do something to him, using a gun or knife. He described Rowe as a person known for having a gun and for getting into violent situations. While at a supper approximately one to one-and-one-half months before the incident, something happened that alerted defendant to be careful whenever he should again encounter Rowe. At the supper, defendant observed Rowe wearing a "cocked" hat, which indicated Rowe wanted to be a gangster.
After presenting the above references to Rowe's alleged bad character, the trial judge noted defendant had gone beyond the court's order at several points in discussing Rowe's character and granted the State's request to cross-examine defendant on the areas raised. The trial judge clarified that this would not open the door to other witnesses or to other episodes other than the incident defendant related.
Defendant then testified regarding the supper incident as follows. Rowe accused defendant of acting superior when defendant attempted to place a call on his (defendant's) cellular phone. Rowe's cousin, Moore, playfully told defendant, "If a n_____ catch you out in the street, they will do you something." Defendant said that no one would do anything to him. Rowe said nothing and defendant walked into the kitchen.
*1240 When defendant returned from the kitchen, Rowe said, "Yeah, n_____, I catch you out there in the street ... and break you off." Defendant, attempting to appear unafraid, told Rowe no one would do anything to him. Rowe and defendant looked at each other. Defendant characterized the look as a confrontation in which "something" could have happened. However, he admitted Rowe did not show him a gun or a knife.
Rowe then repeated his comment to him, saying, "Yeah, n_____, break you something off ... break you something off, real proper." Defendant described the remark as a threat to shoot him, use fists to beat him to death, harm him with a knife, or do "something" to him if he were ever unarmed. Defendant repeated that no one would do anything to him. Rowe looked at defendant and said, "You must be talking to Malcolm; you ain't talking to me, huh?" At this point, defendant felt the situation was becoming serious so he agreed he was talking to Moore and left. Defendant further testified that this incident caused him to fear Rowe.[5]
Thus, we find no merit to defendant's claim that he was precluded from presenting any evidence in this regard. To the extent defendant was prevented from presenting any further alleged corroborative evidence, we address this aspect of the assigned error.
At trial, defendant sought to obtain corroborative testimony from Moore regarding the threats made by Rowe to defendant at the supper. Moore testified he knew Rowe. He stated he had seen defendant and Rowe together. At that point, counsel approached the bench and discussed the extent to which this witness would be allowed to testify on the subject. Based on the trial judge's pretrial ruling on the motion in limine, defense counsel requested the witness be given a limited instruction, allowing him to say the parties had words, but not being allowed to say "threats." Furthermore, defense counsel asked that the witness be allowed to state his opinion that the two did not get along. Defense counsel also stated he wanted to ask this witness questions regarding the location where he saw the parties and the argument that ensued. The State objected based on the failure to show an overt act. The trial judge ruled that the witness could not talk about any conversations which occurred at the supper. Defense counsel objected.
Moore then testified he saw defendant and Rowe at the same location on "numerous occasions," approximately five to ten times. He recalled seeing them at a supper and having a conversation. Defense counsel, in a bench conference, asked the trial judge whether he could ask if the conversation was friendly, to which the trial judge replied that he could not do so. Defense counsel objected.
We note defendant was not only hampered in presenting his defense, but was prejudiced by the fact that Moore, a witness to the supper incident, was not allowed to corroborate defendant's account of the incident. The jury could have reasonably inferred there was no corroborative evidence. Although the trial judge erred in failing to find an overt act, defendant was allowed to testify regarding the supper incident. Thus, we find no reversible error in that regard. However, we find reversible error in the trial judge's refusal to allow corroborative evidence from Moore.[6]
*1241 We are unable to determine whether the exclusion of any additional evidence constitutes reversible error. The limited proffer does not provide the substance of the testimony of the various named and unnamed parties. With regard to the remainder of the proffered evidence, we further note the limited proffer makes it unclear whether at the time of the offense, defendant knew about the shooting incident involving Rowe and Robertson as well as any of the other specifically alleged acts. In Lee, 331 So.2d at 461 the supreme court held:
though prior threats and violent acts, (whether against the accused or against others) might be inadmissible as character evidence, they are admissible if defendant knew of them at the time of the offense.
Therefore, the proffered evidence must be viewed in accordance with the directive in Lee. In the instant case, defendant failed to give the substance of the testimony sought to be admitted. We are mindful that such failure serves as a procedural bar to raising the issue. See La. Code Evid. art. 103(A)(2); State v. Lynch, 94-0543, pp. 17-18 (La.App. 1st Cir.5/5/95), 655 So.2d 470, 480, writ denied, 95-1441 (La.11/13/95), 662 So.2d 466. Without the substance of the proffered evidence, this court cannot determine its admissibility and probative value. State v. Terry, 94-0622, p. 14 (La.App. 1st Cir.4/7/95), 654 So.2d 455, 463, writ denied, 95-1180 (La.10/13/95), 661 So.2d 494. See also La. Code Evid. art. 103(A)(2).
However, we consider State v. Shanks, 97-1885 (La.App. 1st Cir.6/29/98), 715 So.2d 157 controlling. In Shanks, defendant made a limited proffer. Nevertheless, because defendant's constitutional right to present a defense was jeopardized, we remanded the case for a reopened hearing on defendant's motion for new trial whereby competent evidence could be considered by the trial judge in determining whether a new trial should be granted. The Shanks rationale applies herein as well. We find "particular and peculiar circumstances," as in Shanks, which make it appropriate for this court to remand the matter for a hearing as to the admissibility of the proffered evidence noted herein, in accordance with law, and particularly in accordance with Lee. Lee, 331 So.2d at 461; Shanks, 97-1885 at 13-14, 715 So.2d at 164.
We deem it appropriate and necessary to remand this matter for a hearing because defendant's proffer was restricted by the trial judge, and defendant's constitutional right to present a defense was significantly impaired. The ends of justice cannot be served by preventing defendant from even attempting to introduce evidence as to his defense. Thus, we remand for a pretrial hearing, with instructions to the trial judge to review the evidence defendant attempted to proffer, and to make a determination regarding admissibility in accordance with law and the views expressed herein.

OTHER ASSIGNMENTS
Having found reversible error, we pretermit a discussion of assigned errors numbers 3, 4, 5, and 6. However, we note the following regarding the remaining assignment of error number 2, since the issue is likely to recur.
Through assignment of error number 2, defendant argues the trial judge erred in granting the State's motion in limine to exclude Dr. Wade Schindler's testimony in its entirety. However, defense counsel only argues the trial judge erred in failing to accept Dr. Schindler as an expert in the use of deadly force and "stress fire." At trial, defense counsel tendered Dr. Schindler as an expert in the use of deadly force and the general effects that occur when one arms oneself with a firearm in a stressful situation, including physiological and psychological occurrences under these circumstances. The trial judge ruled that he would not accept Dr. Schindler as an expert in the use of deadly force since Dr. Schindler failed to *1242 testify to any expertise in any area which would aid the jury.
Defendant asserts that Dr. Schindler's testimony established the doctor's expertise in reactions and perceptions during such situations. In particular, he asserts Dr. Schindler's testimony demonstrated expertise in the effects of stress on recall and sensory perception, reactions to stress and fear, and conduct standards taught law enforcement officers placed in a hazardous situation. Defendant further asserts Dr. Schindler previously testified as an expert on the use of deadly force.[7]
The trial judge has wide discretion in determining the competence of an expert witness, and his ruling on a witness' qualification will not be disturbed absent an abuse of that discretion. State v. Trahan, 576 So.2d 1, 8 (La.1990).
In State v. Foret, 628 So.2d 1116, 1122-1123 (La.1993), the Louisiana Supreme Court clarified the trial judge's role under La.Code Evid. art. 702 which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The Foret court cited State v. Catanese, 368 So.2d 975, 979, 981-982 (La.1979), and explained the trial judge, in ruling on the admissibility of scientific evidence, performs a "gatekeeping function in balancing the probative value of the evidence against its prejudicial effect." Foret, 628 So.2d at 1123.
The Foret court noted Article 702 was virtually identical to Fed. Rule Evid. 702. As a result, it carefully considered Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-595, 113 S.Ct. 2786, 2796-2798, 125 L.Ed.2d 469 (1993), a case interpreting Fed. Rule Evid. 702. It adopted the guidelines set forth in Daubert for determining the reliability of expert scientific testimony. The Foret court explained that Article 702 required expert testimony to be both relevant and reliable.
Subsequently, in State v. Quatrevingt, 93-1644, pp. 10-12 (La.2/28/96), 670 So.2d 197, 204, cert. denied, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996), the court explained:
In Foret, ... this Court examined and adopted the United States Supreme Court's recently established new standard for the admission of scientific evidence in Daubert .... In Daubert, the Supreme Court held that Federal Rules of Evidence 702, rather than the "general acceptance" standard established by Frye v. United States, 293 F. 1013 (D.C.Cir.1923), controls the admissibility of expert scientific evidence in federal court. Under this new standard, the trial court is required to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." Id.

The reliability of scientific evidence is to be ensured by a requirement that there be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of a "preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts at issue." Foret, 628 So.2d at 1122, citing Daubert ....
*1243 Relying on Daubert, the Quatrevingt court held that in order to determine whether scientific evidence is reliable, the trial court should consider the following factors suggested in Daubert:
(1) The "testability" of the expert's theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
Quatrevingt, 93-1644 at 11, 670 So.2d at 204 (citing Daubert, 509 U.S. at 592-594, 113 S.Ct. at 2796-97).
Our review of the proffered testimony in the instant case reveals that Dr. Schindler gave personal opinions rather than presenting any foundational requirements in support of his assumptions. "An unsupported opinion can offer no assistance to the fact finder, and should not be admitted as expert testimony." Miramon v. Bradley, 96-1872, p.6 (La.App. 1st Cir.9/23/97), 701 So.2d 475, 478 (citing Daubert, 509 U.S. at 589-97, 113 S.Ct. at 2795-98 and Foret, 628 So.2d at 1121-23).
Additionally, defense counsel conceded at trial that Dr. Schindler could not testify that defendant was reasonably in fear of his life at the time of the shooting. Nevertheless, defense counsel explained he was offering Dr. Schindler's testimony for the following purpose:
He's [Dr. Schindler's] also going to testify as to those effects not specific to this case but in general which occur when a person has to arm themselves with a firearm in a stressful situation. He can testify as to physiological and psychological occurrences that are common under those circumstances. And the jurors can compare that to the testimony of Joseph Brooks and decide if there's any relevance to his testimony whatsoever.
Therefore, although conceding Dr. Schindler could not testify that defendant was reasonably in fear of his life at the time, defense counsel nonetheless implied that Dr. Schindler's testimony would be relevant since it would assist the trier of fact in assessing defendant's reactions.
Dr. Schindler testified he holds a Ph.D. degree in criminal justice. He has taken courses in psychology, but does not have a psychology degree. He is president of a training institute for individuals seeking gun permits. Dr. Schindler is also a professor of criminal justice and criminology at a university and a certified vocational technical firearms instructor. His experience consists of employment in the areas of law enforcement, including teaching and training of security officers. Dr. Schindler is certified in the areas of security officer's training and firearms instruction. He is a licensed weapons instructor.
His institute encompasses stress training. He has trained approximately 2,000 to 3,000 trainees in "stress fire" training, and described "stress fire" as follows:
Stress fire is when an individual is put under unusual circumstances and expected to perform in a rational method. Most of your use of deadly force cases involve someone having to perform in an unusual situation that they'reabsolutely have not been in and have to respond in a, what we would consider, a normal response.
His procedure for accomplishing "stress fire" training involves having trainees fire guns, loaded with live ammunition, in front of a large projection screen depicting life-size images. Dr. Schindler would then determine how the trainees handled shooting under stress.
He received training in "stress fire" in 1972 from the FBI in a one-week program. He has had additional training, including a recent three-day course. He characterized his training and expertise to be in "stress fire" for police officers and private security personnel, stating there was no difference *1244 between a policeman and a private citizen since both respond with identical psychological and physiological responses in a life-threatening situation. He monitors his instructors during "stress fire" training for private citizens.
Dr. Schindler concluded that physiological and psychological responses of law enforcement officers, security personnel and private citizens are identical, but gave no basis for that assumption, nor did he indicate he had expertise in the study of human physiological and psychological responses. While he stated he was trained in "stress fire" and utilized a life-size projection to simulate a stressful situation, in order to judge responses, he gave no scientific basis nor methodology to support his conclusion that this technique allowed him the expertise to evaluate psychological and physiological reactions to stress. Furthermore, he admitted he was not trained as a psychologist. His inference that all individuals have identical reactions in the characterized "stress fire" situation before a projection was not derived from scientific method. Consequently, any hypothesis, derived from the inference regarding defendant's alleged reaction at the time of the shooting, is not subject to validation. Dr. Schindler never stated he conducted any research to determine whether his inference was correct, thereby showing a lack of an empirical foundation for his opinion.
The State argues defendant does not specifically indicate how the information would have contributed to the jury's ultimate finding of whether defendant acted in self-defense. There is no showing made that Dr. Schindler's observations of general reactions of individuals to a projected image would "assist the trier of fact to understand the evidence or to determine a fact in issue." La.Code Evid. art. 702.
This assignment lacks merit.

DECREE
Accordingly, for the reasons stated, we reverse the conviction and sentence, and we remand for a new trial in accordance with the views expressed herein. The trial judge is further instructed to conduct a pretrial hearing in order to consider the proffered evidence noted herein and determine its admissibility in accordance with the views expressed herein.
CONVICTION AND SENTENCE REVERSED; AND REMANDED WITH INSTRUCTIONS.
NOTES
[1] Defendant is identified as "Joseph Brooks" in the indictment. He is also identified in the record and at trial as "Joseph Stanley Brooks," and "Reno."
[2] The State argues that most of defendant's assertions, mentioned in brief, regarding Rowe's character, were never proffered into the record. The record shows otherwise.
[3] Defendant testified similarly at trial.
[4] Throughout this opinion, references are made to direct quotes from conversations between the parties. Some of these quotes contain racial epithets that this Court chooses not to utter. These terms are noted as such: "N_____" or "n_____."
[5] The trial judge originally expressed the view he was uncertain that the statements made by Rowe at the supper constituted a threat. However, the alleged statements, although slang, effectively express a threat to kill defendant or inflict serious bodily harm on defendant.
[6] The substantial curtailment of defendant's right to present evidence of his defense cannot be regarded as harmless. See Lee, 331 So.2d at 461; La.Code Crim. P. art. 921.
[7] We note that in Hattori v. Peairs, 95-0144, pp. 6-7 (La.App. 1st Cir.10/6/95), 662 So.2d 509, 513, writ denied, 95-2677 (La.1/12/96), 666 So.2d 322, Dr. Schindler's testimony on the subject of the use of deadly force and whether the actions of defendant were reasonable, was excluded. Dr. Schindler testified that although he had never been qualified as an expert in the use of deadly force in the East Baton Rouge court, he had been previously qualified to testify as an expert in other courts on the use of deadly force.