STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 KA 0940

STATE OF LOUISIANA

VERSUS

JAQUAN XAVIER BATTLEY

Judgment Rendered: __JUL 0 6 2023__

* * * * * * *

On Appeal from the 18th Judicial District Court
In and for the Parish of Pointe Coupee
State of Louisiana
Trial Court No. 83,371-F
Honorable J. Kevin Kimball, Judge Presiding

* * * * * * *

Antonio M. "Tony" Clayton
District Attorney
Chad A. Aguillard
Kristen Canezaro
Assistant District Attorneys
New Roads, Louisiana

Terri Russo Lacy
Assistant District Attorney
Port Allen, Louisiana

Attorneys for Appellant,
State of Louisiana

Meghan Harwell Bitoun
New Orleans, Louisiana

Attorney for Defendant/Appellee,
Jaquan Xavier Battley

* * * * * * *

BEFORE: WELCH, PENZATO, AND LANIER, JJ.

Welch, Jr. Concurs without reasons

**PENZATO, J.**

The defendant, Jaquan Battley, was charged by grand jury indictment with second degree murder (count I), a violation of La. R.S. 14:30.1(A)(1); and illegal use of weapons or dangerous instrumentalities (count II), a violation of La. R.S. 14:94(A). The State dismissed count II prior to the closing of trial. Following a jury trial on count I, the defendant was found guilty as charged by unanimous verdict. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. He now appeals, raising five assignments of error. For the following reasons, we affirm the conviction and sentence.

## FACTS

On July 8, 2019, Aniyah Taylor drove her boyfriend, the victim, Sir James Davis (Mr. Davis), to St. Ann Street in New Roads, Louisiana, to purchase marijuana from "Billy." Prior to making the purchase, Mr. Davis went to the trunk of the vehicle to get jumper cables to help another person at the scene. Thereafter, Kameron Webb approached Mr. Davis and said, "N----s be tripping." Mr. Davis ignored Webb. As Mr. Davis was returning to Ms. Taylor's car, Webb followed him, stating "I want my one," meaning Webb wanted to fight with Mr. Davis. Mr. Davis told Webb he had come to get his "smoke," not to fight him. Webb responded by chasing Mr. Davis back to Ms. Taylor's car, and Mr. Davis and Ms. Taylor left without further incident. On the drive back to his home in Morganza, Louisiana, Mr. Davis telephoned "Billy" and told him to tell Webb to "keep the same energy."[1]

Approximately thirty minutes later, Mr. Davis' sister, Alajanae Davis, drove herself, Ms. Taylor, and Mr. Davis back to New Roads to buy marijuana from "Chip" at a business known as the "Chinese store." When Alajanae pulled into the parking lot of the Chinese store, the defendant walked out of the store, past the driver's-side door of her vehicle, and towards the road. Webb walked into the parking lot of the Chinese

---

[1] According to Ms. Taylor, this phrase meant Mr. Davis would fight Webb the next time they met.

2

store and communicated with the defendant. The defendant then approached Mr. Davis, who was sitting in the passenger side of the car, and the defendant pulled out a gun. Mr. Davis fell to the ground, and he and the defendant wrestled over the gun. The defendant fired at Mr. Davis, striking him four times. Mr. Davis returned fire with his own gun. Following the shooting, Webb and the defendant ran away in the same direction. Mr. Davis died as a result of the gunshot wounds.

## BATSON CHALLENGE

In assignment of error number one, the defendant contends the trial court erred in failing to find that the State deliberately used peremptory challenges to exclude prospective black jurors from serving on the jury in violation of the Equal Protection Clause and *Batson v. Kentucky*. He argues that while the State's reasons for striking potential juror Leslie Frederick were facially race-neutral, the reasons were revealed to be merely a pretext, and the trial court's acceptance of these explanations constituted a prohibited "rubber stamp" approval.

In *Batson v. Kentucky*, 476 U.S. 79, 93-98, 106 S.Ct. 1712, 1721-1724, 90 L.Ed.2d 69 (1986), the United States Supreme Court adopted a three-step analysis to determine whether the constitutional rights of a defendant or prospective jurors have been infringed by impermissible discriminatory practices. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *State v. Jackson*, 2016-1565 (La. App. 1st Cir. 10/12/17), 232 So.3d 628, 632, writ denied, 2017-1944 (La. 5/25/18), 243 So.3d 566.

To establish a prima facie case, the defendant must show: (1) the defendant is a member of a cognizable group; (2) the challenge was peremptory rather than for cause;

3

and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of his being a member of that cognizable group. *State v. Nelson*, 2010-1724 (La. 3/13/12), 85 So.3d 21, 29. Without an inference that the prospective jurors were stricken because they are members of the targeted group, the defendant is unable to make a prima facie case of purposeful discrimination, and his *Batson* challenge expires at the threshold. *Jackson*, 232 So.3d at 632.

The trial court may effectively collapse the first two stages of the *Batson* procedure, whether or not the defendant established a prima facie case of purposeful discrimination, and may then perform the critical third step of weighing the defendant's proof and the prosecutor's race-neutral reasons to determine discriminatory intent. A trial judge may take into account not only whether a pattern of strikes against a suspect class of persons has emerged during voir dire, but also whether the opposing party's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. *Jackson*, 232 So.3d at 632.

The State, in presenting race-neutral reasons for its excusal of prospective jurors, need not present an explanation that is persuasive, or even plausible; unless a discriminatory intent is inherent in the State's explanation after review of the entire record, the reason offered will be deemed race neutral. For a *Batson* challenge to succeed, it is not enough that a discriminatory result be evidenced; rather, that result must ultimately be traced to a prohibited discriminatory purpose. Thus, the sole focus of the *Batson* inquiry is upon the intent of the opposing party at the time he exercised his peremptory strikes. A reviewing court owes the trial court's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. *Jackson*, 232 So.3d at 632-33.

Mr. Frederick was on the first panel of prospective jurors. After the State exercised a peremptory challenge against Mr. Frederick, a black male, the defense

4

objected under *Batson*. The defense argued that Mr. Frederick provided no positive or negative information during voir dire and was being struck solely because he was black.[2] The defense noted, at that stage of voir dire, the State had exercised five peremptory challenges – one against a white male and four against black people.[3]

With regard to Mr. Frederick, the State indicated that when the panel was asked if anyone thought that the defendant did something wrong just because he was arrested, Mr. Frederick raised his hand. According to the State, it was challenging Mr. Frederick because it wanted the defendant to have a fair trial. The trial court noted, under *Batson*, the defense first had to establish that the State was excluding jurors on the basis of race. The trial court questioned if that burden had been met, but moved on to whether or not the State had set forth a race-neutral reason for its challenge against Mr. Frederick. The trial court asked the State if it had any other reason to strike Mr. Frederick. The State added that Mr. Frederick indicated he knew the district attorney. The trial court concluded that, while it was uncertain a prima facie case of discrimination had been shown, the State had offered race-neutral reasons, and thus, it would deny the *Batson* challenge.

On appeal, the defendant notes the record is silent as to whether Mr. Frederick raised his hand as set forth by the State at voir dire. The defendant further points out that it was a different prospective juror, not Mr. Frederick, who stated he knew the district attorney, and thus, the trial court erred in accepting the State's race-neutral reason for striking Mr. Frederick. The defense, however, did not correct the record in either respect at the time of the State's assertions. If the State was mistaken about Mr.

---

[2] During voir dire, Mr. Frederick indicated: he was a truck driver; he felt he could decide whether or not the defendant was guilty based on the facts; he did not know the defendant; he did know some people with the defendant's surname; and he did not know whether or not those people were related to the defendant.

[3] The record reflects that a black woman, Ms. Maloid, requested a hardship excuse, indicating that she had just had surgery. During voir dire, the defense conceded that there was a rational basis for excluding the other two black women, Ms. Scrivens and Ms. Hebert.

Frederick raising his hand or knowing the district attorney, the defense was obligated to object and correct the record. See La. Code Crim. P. art. 841; *State v. Williams*, 524 So.2d 746 (La. 1988) (per curiam) ("The *Batson* decision suggested that the trial judge, if the objections are well founded, can correct the error either by denying the peremptory challenge and reinstating the challenged jurors or by dismissing the venire and selecting a new jury. This suggestion indicates that the ruling on the objections must be made at some time before the completion of the jury panel." [Footnotes omitted.]).

The mere invocation of *Batson* when minority prospective jurors are peremptorily challenged in the trial of a minority defendant does not present sufficient evidence to lead to an inference of purposeful discrimination. *State v. Draughn*, 2005-1825 (La. 1/17/07), 950 So.2d 583, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). All of the black jurors struck by the State were done so for race-neutral reasons. Ms. Maloid was considered for a hardship excuse due to her medical condition. The defense conceded that there was a rational basis for excluding the other two black women, Ms. Scrivens and Ms. Hebert. Although the State provided a race-neutral reason for striking Mr. Frederick, the reason was factually inaccurate; however, the defense did not refute the State's inaccurate assertions about Mr. Frederick. Thus, no pattern of racial discrimination by the State was proven by the defense, for which a *Batson* challenge should be granted. See *State v. Duncan*, 1999-2615 (La. 10/16/01), 802 So.2d 533, 546-47.

This assignment of error is without merit.

## ADMISSION OF VIDEOS

In assignment of error number two, the defendant contends that two rap videos were erroneously admitted as they constituted inadmissible and prejudicial hearsay evidence.

At trial, the State and the defense stipulated that there was a criminal street gang named Young and Wreckless that existed within the confines of the 18th Judicial District, including New Roads, Louisiana; that Webb, Tyler Davis, and Tyreke Joseph were members of the Young and Wreckless criminal street gang; and that Detective Alexander Nezgodinsky was a criminal gang expert for the Louisiana State Police.[4]

Detective Nezgodinsky testified at trial that he worked closely with the East Baton Rouge Sheriff's office criminal intelligence, and at the end of 2018, learned of the existence of a group of individuals calling themselves Young and Wreckless who were committing certain crimes in the West Baton Rouge, Pointe Coupee, and East Baton Rouge city areas. Detective Nezgodinsky testified that in connection with his investigation of Young and Wreckless, he reviewed certain rap music videos, which contributed to his opinion that Webb and the defendant were members of Young and Wreckless.

In connection with Detective Nezgodinsky's testimony, the State sought to introduce two rap videos: "Loyal" and "Free JJ."[5] The State contended that it was introducing "Loyal" to establish the defendant's association with Young and Wreckless and was introducing "Free JJ" because it was taken at the crime scene and showed the defendant's group paying homage to him. The defense objected to the introduction of both videos. Defense counsel argued the videos were irrelevant and more prejudicial than probative because "Loyal" was recorded before the incident and

---

[4] Prior to trial, the State gave notice of its intent to use evidence at trial of other crimes, wrongs, and acts committed by the defendant. The State set forth that it intended to prove the defendant and Webb were confirmed members of the Young and Wreckless criminal street gang. Additionally, the State indicated it intended to introduce photos and videos of the defendant and Webb with other members of the gang to establish their status in the gang. The State argued evidence of the relationship was admissible for the purpose of showing proof of motive, opportunity, intent, knowledge, and identity, or that the relationship between the defendant and Webb was integrally related to the murder on July 8, 2019.

Detective Nezgodinsky testified at the subsequent 404(B)(1) hearing. Following the hearing, the trial court found that the State had established the existence of a criminal street gang named Young and Wreckless. Based on that finding, the trial court indicated that it would allow the State to proceed with its theory that the July 8, 2019 shooting was related to gang activity.

[5] Detective Nezgodinsky testified the defendant was known as "JJ."

"Free JJ" was recorded after the incident. In regard to "Free JJ," the defense argued the video was not relevant in any way because it involved neither Mr. Davis nor the defendant and was hearsay because it was performed by people not present in court to testify.

The trial court allowed the admission of both videos, ruling that, because there was no stipulation that the defendant was a member of Young and Wreckless, the State was allowed to use the videos to prove the defendant's motive as a gang member.

Both videos were then played for the jury. Detective Nezgodinsky testified "Loyal" was filmed prior to the July 8, 2019 shooting. He identified Webb and the defendant, who was wearing a shirt with the gang's initials, in the video. Detective Nezgodinsky testified "Free JJ" was filmed after the July 8, 2019 shooting, at the crime scene, which the gang referred to as the "China store," and glorified the murder of Mr. Davis. One of the individuals in the video held up a cell phone with a picture of Webb and the defendant. Detective Nezgodinsky testified that in the video, there is a statement that the defendant "zipped him," meaning the defendant shot Mr. Davis. According to Detective Nezgodinsky, the gang was "telling a story by making a video. They're rapping about it. Pretty much in detail at what happened. And then you have...Webb in the video supporting this because he was also at the scene of the crime....To me, there is no remorse. They're glorifying the action of what happened."

"Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. Code Evid. art. 801(C). Hearsay evidence is generally not admissible, unless provided for by the Code of Evidence or other legislation. La. Code Evid. art. 802. On appeal, the defendant contends the State introduced the videos and lyrics of the songs to prove the truth of the matter: that the defendant was a member of Young and Wrestless and that he killed Mr. Davis motivated by his loyalty to that group. While we find no error in the admission of "Loyal," we agree with the defendant that

8

the statement in "Free JJ" that the defendant "zipped" Mr. Davis was hearsay. While the State argues the evidence was relevant, it fails to provide any exception to the general hearsay prohibition.

Confrontation errors are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); see also La. Code Crim. P. art. 921. The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*; *State v. Wille*, 559 So.2d 1321, 1332 (La. 1990). The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *State v. Broadway*, 96-2659 (La. 10/19/99), 753 So.2d 801, 817, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000); *State v. Shoemaker*, 2006-0505 (La. App. 1st Cir. 11/3/06), 2006 WL 3109423, *2, writ denied, 2006-2806 (La. 6/22/07), 959 So.2d 495.

To the extent that the alleged hearsay in "Free JJ" established that the defendant shot Mr. Davis, that evidence was cumulative of evidence from the surveillance video of the incident introduced into evidence and from the testimony of Ms. Taylor that the defendant approached Mr. Davis, pulled out a weapon, and shot him before Mr. Davis returned fire with his own weapon. After considering all relevant factors, we conclude the guilty verdict rendered in this particular trial was surely unattributable to the error in the admission of the statement in "Free JJ" that the defendant "zipped" Mr. Davis,

9

considering that the defense did not deny that the defendant shot Mr. Davis, but instead claimed that the shooting occurred in self-defense. See *Shoemaker*, 2006 WL 3109423 at *3.

This assignment of error is without merit.

## MOTION FOR MISTRIAL

In assignment of error number three, the defendant contends the trial court erred in failing to grant his motion for mistrial based on the State's expert witness referencing a matter that the parties agreed was inadmissible.

Louisiana Code of Criminal Procedure Article 775 provides, in pertinent part, that a mistrial shall be ordered, and, in a jury trial, the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

Louisiana Code of Criminal Procedure Article 771(2) provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> . . .
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

A mistrial under the provisions of La. Code Crim. P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. However, a mistrial is a drastic remedy that should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Determination of whether a mistrial should be granted is within the sound

10

discretion of the trial court, and the denial of a motion for mistrial will not be disturbed on appeal without abuse of that discretion. *State v. Prater*, 2015-0079 (La. App. 1st Cir. 11/6/15), 2015 WL 6835423, *7, writ denied, 2015-2234 (La. 4/22/16), 191 So.3d 1046 (unpublished).

Unsolicited and unresponsive testimony is not chargeable against the State to provide a ground for mandatory reversal of a conviction. Furthermore, a statement is not chargeable to the State solely because it was in direct response to questioning by the prosecutor. While a prosecutor might have more precisely formulated the question that provoked the witness's response, where the remark is not deliberately obtained by the prosecutor to prejudice the rights of the defendant, it is not the basis for a mistrial. *Id.*

Moreover, even if a mistrial is warranted under Articles 770, 771, or 775, the failure to grant a mistrial does not result in an automatic reversal of the defendant's conviction, but is a trial error subject to the harmless error analysis on appeal. Trial error is harmless where the verdict rendered is "surely unattributable to the error." *Id.* at *8.

On direct examination, Detective Nezgodinsky testified that a surveillance video taken from a location next door to the China store showed "some kind of a communication" between the defendant and Webb near the roadway. The State asked, "[t]ell me in your expert [opinion] as a criminal gang expert, is that significant, this communication right before the murder?" Detective Nezgodinsky answered affirmatively, and the State asked him to explain. Detective Nezgodinsky stated, "[The defendant] had a chance to walk away. But he stopped, got some kind of a communication with another member of the gang who committed a shooting in the past. He's giving him – something was said."

The defense moved for a mistrial, arguing that the statement violated the

stipulation.[6]  The State argued the purpose of its question was to determine the significance of Webb and the defendant meeting at the roadway.  The trial court denied the motion for mistrial.  The trial court found the statement about Webb having been involved in a prior shooting was unsolicited, and further noted Detective Nezgodinsky was an expert and had previously testified about the gang's activity in laying a foundation for his testimony.  The trial court further noted the statement involved a crime by a non-party, not a crime alleged to have been committed by the defendant.  The trial court indicated it found the statement to be harmless, and offered a curative instruction to the jury to disregard testimony that may have addressed other criminal activity because it was stipulated that a gang existed.  The defense did not accept the offer.

We find no abuse of discretion in the denial of the motion for mistrial.  The State asked Detective Nezgodinsky to explain the significance of the defendant meeting a gang member prior to shooting Mr. Davis, not for the criminal history of that gang member.  Accordingly, the State did not deliberately elicit Webb's criminal history from the witness, and thus, the unsolicited testimony provided no basis for a mistrial.  Further, the response of the witness did not result in such substantial prejudice to the defendant that he was deprived of any reasonable expectation of a fair trial.  The defense stipulated to the existence of a gang, and Detective Nezgodinsky had previously testified as to criminal activity by the gang.  Additionally, the unsolicited comment did not concern the defendant's criminal history.  Compare La. Code Crim. P. art. 770(2).  Moreover, the prosecutor's question was not deliberately designed to prejudice the rights of the defendant.  See State v. Tran, 98-2812 (La. App. 1st Cir. 11/5/99), 743 So.2d 1275, 1280, writ denied, 99-3380 (La. 5/26/00), 762 So.2d 1101.

This assignment of error is without merit.

---

[6] The trial court noted the stipulation concerning Webb being a member of Young and Wreckless, a street gang, made reference to other criminal acts of the gang unnecessary.

## DEMONSTRATIVE EVIDENCE

In assignment of error number four, the defendant contends the trial court erroneously permitted the State to present opinion evidence from a witness who was not offered as an expert.

The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. Code Evid. art. 701. A law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert. However, only experts are allowed to give opinion testimony in areas of specialized knowledge. La. Code Evid. art. 702. A reviewing court must ask two questions to determine whether the trial court properly allowed lay opinion testimony: 1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations, and 2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. *State v. Thornton*, 2019-1029 (La. App. 1st Cir. 7/23/20), 309 So.3d 366, 372, writ denied, 2021-00003 (La. 4/13/21), 313 So.3d 985.

At trial, the State called West Baton Rouge Parish Sheriff's Office Detective Christopher Bouquet, who had been in law enforcement for twenty-six years. He assisted the State in this matter by analyzing two surveillance videos and several reports taken of the incident, and using that information to create a PowerPoint presentation to demonstrate what the security cameras at the scene showed happened during the incident. The PowerPoint presented images of still shots taken from the videos and aerial photographs of the crime scene. The State did not offer the PowerPoint into evidence, but wanted it available as a demonstrative aid for Detective Bouquet.

The defense objected to the use of the PowerPoint, arguing it was hearsay,

13

irrelevant, violative of the "best evidence rule,"[7] and that Detective Bouquet had not been qualified as an expert. In response, the State relied upon *State v. Lanham*, 31,791 (La. App. 2d Cir. 3/31/99), 731 So.2d 936, writ denied, 99-1320 (La. 1/14/00), 753 So.2d 207, which involved a conviction for vehicular homicide. In *Lanham*, the defendant argued on appeal that the trial court erred in admitting a video depicting how the accident occurred. *Id.* at 939. At trial, Sergeant Rogers, an expert in crime scene and accident reconstruction, consolidated three recordings, from different angles of the intersection where the accident occurred, into one video. *Id.* at 941. The court in *Lanham* found the video was relevant and admissible as demonstrative evidence of the State's representation of the speed, distance and time relationships involved in the accident, and the trial court correctly overruled the objection to the video, noting that the jury could determine the weight to be given to the evidence. *Id.* at 942.

Here, the trial court found that Detective Bouquet was not being offered as an expert, but as a police officer with twenty-six years' experience in the police force, and could give his interpretation of the crime scene. The court noted it would permit the State to use the demonstrative aid to assist the jury in understanding the sequence of events and that the defense would have full cross-examination to point out any errors.

Detective Bouquet testified that after reviewing the surveillance videos and reports, he created the PowerPoint using screenshots from the surveillance videos and a satellite view of the scene. Thereafter, the PowerPoint was played for the jury while Detective Bouquet described the slides.

A trial court's ruling on the admissibility of evidence, whether photographic or video, will generally not be disturbed on appeal unless the prejudicial effect of the evidence outweighs its probative value. *Lanham*, 731 So.2d at 941-42. The

---

[7] The repeal of La. R.S. 15:436 and the adoption of the Code of Evidence resulted "in the demise of any broad 'best evidence' rule of exclusion of evidence." *State v. Francis*, 597 So.2d 55, 59 (La. App. 1st Cir. 1992), quoting La. Code Evid. Chapter 10, Introductory Note, p. 127 (West 1991).

PowerPoint at issue in this case was not admitted into evidence, but rather, was used strictly for demonstrative purposes. See *State v. Brown*, 2000-1951 (La. App. 1st Cir. 5/11/01), 808 So.2d 622, 627 n.3. ("[w]e note that under the approach taken by other courts that have considered the issue, there would have been no error if [the exhibit], rather than being admitted into evidence, had merely been shown to any of the witnesses and/or the jury for demonstrative purposes.").

Detective Bouquet's testimony was not speculative opinion, but rather a discussion of the surveillance videos based on his observations. See *Thornton*, 309 So.3d at 372. The defense never argued the PowerPoint misrepresented the scene, a proper foundation was laid for the video/photographs included in the PowerPoint, and Detective Bouquet's testimony was based on his decades of experience and personal observations of what he saw depicted in the videos. Further, there was little, if any, prejudice from the PowerPoint and from Detective Bouquet's testimony because the surveillance videos were already in evidence. Lastly, the PowerPoint and Detective Bouquet's testimony was probative and helpful to the determination of facts in issue, *i.e.*, the locations of the persons present at the incident.

Moreover, even assuming, arguendo, that the trial court erred in allowing Detective Bouquet's testimony, we cannot say the resulting testimony was "so prejudicial to the defense as to constitute reversible error." See *Thornton*, 309 So.3d at 372. Independently of Detective Bouquet's testimony, Ms. Taylor testified that the defendant approached Mr. Davis, pulled out a weapon, and shot him, before Mr. Davis returned fire with his own weapon.

This assignment of error is without merit.

## EVIDENCE OF THE DANGEROUS CHARACTER OF THE VICTIM

In assignment of error number five, the defendant contends the trial court erroneously prevented the defense from eliciting Mr. Davis' reputation for carrying a firearm, which curtailed the defendant's right to present a defense.

15

Evidence of a person's character generally is not admissible to prove that the person acted in conformity therewith on a particular occasion. La. Code Evid. art. 404(A). However, there are specific exceptions to this general rule. Relevant here is the exception with respect to evidence of the dangerous character of the victim of a crime. Such evidence is admissible when the accused offers evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged. La. Code Evid. art. 404(A)(2). Thus, in order to introduce any evidence regarding the victim's character, it had to first be shown that the victim made some hostile demonstration or overt act at the time of the offense charged. *State v. Hasten*, 2007-1025 (La. App. 1st Cir. 12/21/07), 2007 WL 4480667, *6, writ denied, 2008-1542 (La. 4/24/09), 7 So.3d 1201.

At trial, the court sustained the State's objection to cross-examination of Alajanae Davis concerning whether Mr. Davis was known to regularly carry a firearm. The court noted the objection of the defense to the ruling.

On appeal, the defendant argues this case is similar to *State v. Brooks*, 98-1151 (La. App. 1st Cir. 4/15/99), 734 So.2d 1232, writ denied, 99-1462 (La. 11/12/99), 749 So.2d 651, and *Hasten*. In *Brooks*, the defendant was charged with second-degree murder and convicted of manslaughter. At trial, the defendant and his friend Tammy Woodard testified that they were approached by Michael Rowe and Gregory Robertson after leaving a dance and, in the ensuing struggle, the defendant fatally shot Rowe. *Brooks*, 732 So.2d at 1233. The defendant claimed self-defense and defense of another. *Id.* The trial court denied the defendant's motion to allow evidence of Rowe's allegedly abusive behavior toward the defendant, including death threats and other provocative actions. *Id.* at 1234. On appeal, this court found evidence of an overt act and reversible error, agreeing with the defendant that the trial judge usurped the jury's fact-finding function by weighing inconsistent testimony, specifically crediting the testimony of two men with Rowe during the alleged assault denying that they followed

16

the defendant and Woodard. *Id.* at 1238.

In *Hasten*, the defendant was charged with second-degree murder and was found guilty as charged. The body of Jordan Clark was found on the ground outside of the defendant's trailer, and the defendant admitted shooting the victim but claimed self-defense. *Hasten*, 2007 WL 4480667 at *2. The defendant stated Clark pressed a gun against his side and threatened to kill him immediately before the shooting. *Id.* A State witness, Devon Green, testified he was "more sure than not" that Clark had a gun in the encounter and that he grabbed the defendant and "they were scuffling like and [Clark] was putting something in [the defendant's] side." *Id.* at *4. At trial, the court allowed the introduction of evidence of Clark's general reputation for being dangerous and violent, but limited the testimony of a witness concerning Clark's reputation for carrying a firearm. *Id.* at *6. On appeal, this court found reversible error in the trial court's refusal to allow testimony as to specific acts of violence known by the defendant and committed by Clark. *Id.* at *8.

In the instant case, the video surveillance and the testimony of multiple witnesses established that the defendant was the aggressor in the incident, and that Mr. Davis was retreating when the defendant shot him. Ms. Taylor testified that she alerted Alajanae Davis when she saw Webb walking towards the convenience store because she thought the defendant and Webb were going to "jump" Mr. Davis. Ms. Taylor also testified she neither heard Mr. Davis threaten the defendant nor saw Mr. Davis pull a gun on him. Additionally, she testified, and the surveillance footage showed, that Mr. Davis was retreating into the car prior to his struggle with the defendant. Alajanae Davis also testified that Mr. Davis was retreating back into the car prior to the struggle with the defendant. Further, the altercation that preceded the shooting was between Mr. Davis and Webb, and Webb was the aggressor; no evidence at trial indicated that the defendant even knew Mr. Davis. Lastly, although Mr. Davis possessed and fired a gun during the incident, he acted after he had been approached and shot by the

17

defendant and after he was lying on the ground. Accordingly, the defendant failed to produce evidence of a hostile demonstration or an overt act on the part of Mr. Davis at the time of the offense, and thus, evidence of his dangerous character was inadmissible.

This assignment of error is without merit.

**CONVICTION AND SENTENCE AFFIRMED.**