# NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2023 KA 1178

## STATE OF LOUISIANA

## VERSUS

## MARGARET CAMAILLE STOCKSTILL

*DATE OF JUDGMENT:* **OCT 1 1 2024**

ON APPEAL FROM THE TWENTY SECOND JUDICIAL DISTRICT COURT
PARISH OF ST. TAMMANY, STATE OF LOUISIANA
NUMBER 589076, DIVISION D

HONORABLE JOHN A. KELLER, JUDGE

* * * * * *

Warren LeDoux Montgomery
District Attorney
Matthew Caplan
Assistant District Attorney
Covington, Louisiana

Counsel for Plaintiff-Appellee
State of Louisiana

Gwendolyn Brown
Baton Rouge, Louisiana

Counsel for Defendant-Appellant
Margaret Camaille Stockstill

* * * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

Hester, J. Concurs

Disposition: **AFFIRMED.**

**CHUTZ, J.**

The defendant, Margaret Camaille Stockstill, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, to which she pled not guilty. Following a jury trial, she was found guilty as charged and sentenced to life imprisonment. This court affirmed the defendant's conviction and sentence. However, the Louisiana Supreme Court reversed and remanded for a new trial.[1] See *State v. Stockstill*, 2018-1586 (La. App. 1st Cir. 7/3/19), 2019 WL 2880336 (unpublished), reversed, 2019-01235 (La. 10/1/20), 341 So.3d 502 (per curiam).

Following the defendant's second jury trial, she was found guilty of the responsive verdict of negligent homicide, a violation of La. R.S. 14:32(A)(1). The trial court denied her motion for new trial and sentenced her to five years imprisonment. The defendant filed the instant appeal, designating five assignments of error. For the following reasons, we affirm the conviction and sentence.

## FACTS

On April 14, 2017, the defendant visited the home of her close friend, Kristin Copeland, in St. Tammany Parish. When Copeland's fiancé, Cody Couch, returned home from the bar, Copeland, Couch, and the defendant got into a verbal and physical altercation which ended with the defendant fatally shooting Couch. A few days later, the defendant was arrested for Couch's death.[2]

---

[1] The Louisiana Supreme Court found the trial court committed reversible error in admitting lay opinion testimony. *State v. Stockstill*, 2019-01235 (La. 10/1/20), 341 So.3d 502, 507-08 (per curiam).

[2] The defendant was advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to each statement made.

2

## SUFFICIENCY OF THE EVIDENCE

In her first assignment of error, the defendant argues the evidence at trial was insufficient to support her conviction of negligent homicide, as the evidence showed she killed Couch in self-defense or defense of others.[3]

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Labee*, 2022-0995 (La. App. 1st Cir. 2/24/23), 361 So.3d 1072, 1076; see also La. C.Cr.P. art. 821(B).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt the defendant was guilty of every essential element of the crime. *State v. Coleman*, 2021-0870 (La. App. 1st Cir. 4/8/22), 342 So.3d 7, 12, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is

---

[3] In her fifth assignment of error, the defendant argues the trial court erred in denying her motion for new trial based, in part, on the insufficiency of the evidence. The question of the sufficiency of evidence is properly raised by a motion for post-verdict judgment of acquittal, not a motion for new trial. See La. C.Cr.P. art. 821. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See La. C.Cr.P. art. 858. Accordingly, the denial of the defendant's motion for new trial is not subject to review on appeal. *State v. Anthony*, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 770 n.3, writ denied, 2024-00024 (La. 5/21/24), 385 So.3d 242.

3

guilty unless there is another hypothesis that raises a reasonable doubt. *Labee*, 361 So.3d at 1078-79.

Negligent homicide is defined, in pertinent part, as the killing of a human being by criminal negligence. La. R.S. 14:32(A)(1). Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. La. R.S. 14:12.

When a defendant claims self-defense in a homicide case, the State has the burden of establishing beyond a reasonable doubt the defendant did not act in self-defense. *Labee*, 361 So.3d at 1076-77. A homicide is justifiable when committed in self-defense by one who reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and the killing is necessary to save himself from that danger. La. R.S. 14:20(1). Additionally, it is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent the person attacked could have justifiably used such means himself, and when it is reasonably believed such intervention is necessary to protect the other person. La. R.S. 14:22. However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless the person withdraws from the conflict in good faith and in such a manner that the person's adversary knows or should know the person desires to withdraw from and discontinue the conflict. La. R.S. 14:21. On appeal, the relevant inquiry is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt the defendant did not act in self-defense. *Labee*, 361 So.3d at 1077.

4

At trial, Kristin Copeland testified that in 2017, she lived with her fiancé, Couch, their six-month-old daughter ("the baby"), and her six-year-old son. Copeland testified that on the night of April 14, 2017, Copeland, Couch, and the defendant planned to drink alcohol and play cards at Copeland's home after she put her children to sleep. Couch borrowed the defendant's car to buy alcohol and cards from the store. Before he left, the defendant removed her gun from her car and put it in her purse because Couch was on probation for driving while intoxicated (DWI) and could not be in the presence of a firearm. When Couch returned, he told Copeland he was going to the bar to play pool, and she became upset. While Couch was at the bar, Copeland called and texted him repeatedly, drank almost a full bottle of tequila, and placed a bag filled with Couch's clothes on the porch. She then sent Couch a text message stating: "Your things are packed. Be gone." Copeland also sent Couch a photo of a pile of clothes burning in her yard.[4] Believing Couch would return home soon, Copeland locked the front door. The defendant then recommended Copeland hide the firearm she kept on top of her refrigerator, which Copeland did. Copeland also kept two stun guns in the same spot.

Copeland testified Couch then returned home and repeatedly knocked on and kicked the front door while she told him to leave. Couch eventually entered the house through the back door. Copeland and Couch went into the living room, where Copeland again told Couch to leave multiple times and shoved him towards the front door.[5] According to Copeland, Couch was drunk and agitated.

---

[4] A digital forensic examination of Couch's and Copeland's phones revealed that while Copeland's phone sent the message about the clothes burning, Couch's phone never received the message.

[5] The defendant recorded this portion of the incident, as well as subsequent portions occurring immediately prior to the shooting, on her cell phone. The content of the video will be discussed more thoroughly later in this section.

Copeland threatened to call the police because she did not see an end to the argument and did not want Couch at the house. Copeland testified that at some point, she retrieved one of her stun guns and walked up to Couch, who "bear-hugged" her. As a result, both of them fell onto the coffee table, breaking the drinking glasses on top of the table. As Couch and the defendant argued, Copeland told Couch to stop yelling at the defendant. Couch then mocked them and threatened to damage the defendant's car, to which the defendant responded she would "put a bullet in him" if he did so.

Copeland testified the baby then started crying, and Couch headed towards the baby's room. Although she told him not to go in the room, she testified she was not afraid he would harm the baby. Copeland followed Couch into the baby's room, and the defendant followed Copeland. Copeland then leaned over the crib to check on the baby and "got shoved from behind." The front of the crib snapped and broke while the baby was still lying in it, and Copeland and Couch fell to the floor. When Copeland looked over, she saw the defendant on top of Couch, hitting him, until Couch shoved the defendant off him and went back to the living room, with Copeland and the defendant close behind.

Copeland's testified that Couch and the defendant "had a couple of words" as she walked away towards the kitchen, after which the defendant retrieved her gun from her purse. Copeland then heard Couch laugh and ask, "[S]o what are you going to do[,] shoot me[?]" When Copeland turned around, the defendant shot Couch. According to Copeland, Couch's hands were down by his side prior to being shot. Copeland testified although she shoved Couch throughout the conflict, Couch did not threaten to harm or physically retaliate against her or the defendant in any way. She further testified she was not afraid for her life or her children's

6

lives at any time and maintained that the defendant did not need to shoot Couch because he was not a violent person.

The defendant also testified. According to her testimony, on the night of the shooting, Couch borrowed her car to go to the store. Because Couch was out on bond for a DWI charge and could not be around firearms, the defendant moved her gun from her car to her purse. Later, Couch returned with a half-empty bottle of tequila and argued with Copeland about him going to the bar until he eventually left. The defendant testified Copeland was angry, drank heavily, and repeatedly called Couch while he was gone. Copeland then lit the clothes on fire in the yard while on the phone with Couch, who was mad and screaming at Copeland.

The defendant testified she gathered her things and began putting them in her car but stopped to help Copeland secure the windows, lock the doors, and hide Copeland's gun. As the defendant opened the front door, Couch ran towards the house. Copeland then slammed the door closed and locked it. Couch banged on the door while Copeland told him to leave. Couch then entered the house through the back door and argued with Copeland in the kitchen. As Copeland backed away into the living room, Couch grabbed Copeland and slammed her down on the coffee table, which struck the defendant's legs. Couch then got on top of Copeland, who was face down, and grabbed her by her hair.

The defendant testified the fight then moved to the kitchen, where she saw Couch grab something on top of the fridge. When Copeland and Couch returned to the living room, Copeland had a stun gun, and Couch had what appeared to be a spackle knife. The conflict subsided slightly as Couch mocked them and Copeland told him to leave again. The defendant testified she then set her phone to record and put it in her purse because Copeland refused to call 911. At that point, Couch came towards her and looked as if he was going to grab her, so she grabbed his

7

hands. Couch then pinned the defendant's arms back against the sofa as he screamed in her face. After Copeland pulled Couch off the defendant, Couch shoved Copeland, and Couch and Copeland struggled on the floor.

The defendant testified that after the baby started crying, Couch and Copeland headed toward the baby's room, and she followed them. According to the defendant, Couch slammed the crib, which held the baby, against the wall three times and, when she tried to intervene, Couch struck her. She fell to the ground, and Couch punched her in the back. Copeland pulled Couch off the defendant, and Couch slammed Copeland against the baby's crib while the baby was still in it. Couch then pushed the defendant onto a chest and grabbed her throat, at which point the defendant kicked him. Copeland again pulled Couch off the defendant, who then ran to her phone to call 911 as Copeland and Couch fought on the floor. Once the defendant retrieved her phone, Couch grabbed her by the feet, which made her drop the phone. The defendant recovered the phone and said, "I got your a\*\*; I got your a\*\*[.]"[6] After she stopped the recording to call 911, Couch yanked the phone out of her hand, threw it off the porch, and locked the door. As Couch walked towards her, the defendant stepped back towards the sofa and grabbed her gun out of her purse.

The defendant testified as she walked toward the kitchen with the gun in her hand, Couch put his arm against her throat, pushing her into the doorframe. At that point, she tried to shoot at the ground to scare him, but the safety was on. She then kneed him in the genitals, crawled towards the kitchen, and took the safety off. When she noticed Copeland and Couch fighting on the kitchen floor, while holding the gun, she pulled Copeland behind her. Couch then came towards her, grabbed the gun (which was down by her side), pulled the gun against him, and told her to shoot him. They struggled over the gun. The defendant testified that when Couch

---

[6] The defendant testified she was referring to her calling 911.

placed his hand on the gun and grabbed her wrist, she pulled the trigger. The defendant stated she shot Couch because she was afraid that he would disarm her, she felt like she was going to die, and she believed she had no other option but to shoot him.

A key piece of evidence at trial was the video recorded on the defendant's cell phone, which captured mainly audio footage, as the defendant placed the phone in her purse shortly after she started recording. The video begins with Copeland, Couch, and the defendant yelling while the baby cries in the background. Copeland repeatedly tells Couch to stop yelling and urges him to leave, and then breaking glass and slapping are audible. Couch refuses to leave, stating Copeland burned his things. At some point, Couch mentions the baby's crying, and Copeland yells, "No! Don't go back there!" While the voices become more distant as they go into the baby's room, screaming, loud banging, slapping, and furniture breaking are clearly audible. Shortly thereafter, the defendant retrieves her phone from her purse, and Couch appears over her shoulder before the defendant drops the phone. A scuffle can be heard while Copeland screams, "Get off of me!" The defendant then recovers her phone and states, "I got your ass. I got your ass."

Responding officers noted the back door of the home appeared damaged, and the living room and baby's room appeared disturbed. In the living room, there was blood, broken glass, out of place furniture, and scuff marks on the floor. In the baby's room, there was more blood, a stun gun, an overturned shelf, and a damaged crib.

Officers photographed Copeland and the defendant in the early morning hours of April 15, 2017. Copeland had "little" streaks on her neck, purple discoloration on her ear, red marks on her hands, a small bruise on her left arm,

scratches, redness, possible bruising, and a cut on her foot. The defendant had red marks or scratches on her face, neck, hands, arms, legs, and back; discoloration or bruising on her arms, back, and legs; and a cut on her left ring finger.

Dr. Michael DeFatta performed Couch's autopsy and testified Couch died from a single gunshot wound to his abdomen. Based on the amount of soot present on Couch's shirt and skin, Dr. DeFatta testified the gunshot wound was close-range, estimating the barrel of the firearm was only one to two inches away. Dr. DeFatta noted Couch had bruises on his forehead, back, left arm, hands, and scrotum, as well as abrasions on his face, neck, back, and left arm. Dr. DeFatta also performed a toxicology analysis, which showed Couch had a blood alcohol content of 0.223 and tested positive for cannabinoids (marijuana) and nicotine.

Doris Hoffpauir, the State's expert in forensic DNA examination, analyzed the DNA evidence collected in this case. Hoffpauir testified the DNA results on the gun were inconclusive; however, based on additional Y-STR tests, she determined the male DNA profile on the barrel of the gun was not consistent with Couch's DNA profile. Additionally, the DNA profiles found on the defendant's and Copeland's fingernail scrapings were consistent with Couch's DNA profile. However, the defendant and Copeland were excluded as major donors of the DNA on Couch's fingernail scrapings.

George Schiro, the defense's expert in forensic DNA analysis and crime scene reconstruction, testified he agreed with the majority of Hoffpauir's conclusions. However, he disagreed with her exclusion of Couch as the male DNA donor on the trigger, hammer, and grip of the gun. Schiro stated he would not have excluded Couch as the DNA donor on the gun, as he found the male DNA consistent with Couch's Y-STR profile. Schiro also examined the soot rings on

Couch's clothes. Based on the location of the soot rings, Schiro believed the gunshot wound was from a contact shot.

On appeal, the defendant argues the State failed to prove beyond a reasonable doubt the homicide was not committed in self-defense or in defense of others. Specifically, she claims the jury irrationally believed Copeland's testimony, which was not credible or consistent with the physical evidence and the statements made in the audio recording.

Upon review of the entire record, we find a rational trier of fact could find beyond a reasonable doubt the defendant committed negligent homicide and such homicide was not committed in self-defense or in defense of others. It is clear the jury, in finding the defendant guilty, rejected the defendant's defense. We cannot say they were unreasonable in doing so. Copeland and the defendant provided two conflicting stories as to what transpired in the moments leading up to Couch's death, and the jury was required to resolve several factual disputes. While the testimony differed as to whether Couch attacked the women or grabbed the gun, both established the defendant, in response to an escalating physical fight, pulled out her gun and shot and killed Couch. The jury was also presented with opposing expert testimony on whether Couch's DNA was on the gun and whether the gunshot wound was a close-range or contact wound. To resolve the factual discrepancies herein, the jury had to weigh the respective credibility of the witnesses and make credibility determinations, which this court cannot second-guess. See *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Accordingly, this assignment of error is without merit.

## VIOLENT CHARACTER EVIDENCE

11

In her second assignment of error, the defendant argues the trial court violated her right to present a defense by limiting her ability to present evidence of Couch's violent character.

A criminal defendant has the constitutional right to present a defense. U.S. Const. amends. VI and XIV; La. Const. art. I, § 16; *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Evidentiary rules may not supersede the fundamental right to present a defense. *State v. Van Winkle*, 94-0947 (La. 6/30/95), 658 So.2d 198, 202. Such right, however, does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value it is substantially outweighed by other legitimate considerations in the administration of justice. *State v. Mosby*, 595 So.2d 1135, 1138 (La. 1992).

Generally, evidence of a person's character is not admissible to prove the person acted in conformity with such character on a particular occasion. See La. C.E. art. 404(A). However, a defendant may introduce evidence of the victim's dangerous character if she first presents appreciable evidence tending to establish that, at the time of the incident, the victim committed an overt act or made a hostile demonstration at the time of the offense charged. See La. C.E. art. 404(A)(2)(a); *State v. Williams*, 2019-00490 (La. 4/3/20), 340 So.3d 761, 762-63 (per curiam), cert. denied, ___U.S. ___, 141 S.Ct. 1377, 209 L.Ed.2d 123 (2021); *State v. Adams*, 2017-0419 (La. App. 1st Cir. 12/29/17), 2017 WL 6629300, *7 (unpublished), writ denied, 2018-0873 (La. 2/18/19), 265 So.3d 773. In this context, an "overt act" is any act of the victim which would have created, in the mind of a reasonable person, a belief she was in immediate danger of losing her life or suffering great bodily harm. See *State v. Edwards*, 420 So.2d 663, 669 (La. 1982); *Adams*, 2017 WL 6629300 at *7. See also *State v. Brown*, 172 La. 121, 129, 133 So. 383, 386 (1931).

Once the defendant presents appreciable evidence of an overt act, the trial court cannot exercise a credibility determination to refuse the defendant the right to have the jury determine the merits of his plea of self-defense. *Williams*, 340 So.3d at 763. Thereafter, the defendant is entitled to introduce evidence of the victim's prior threats or violent character for two distinct purposes: (1) to show defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict. *State v. Burton*, 2019-01079 (La. 6/30/21), 320 So.3d 1117, 1121 (per curiam). Only evidence of general reputation and not specific acts is admissible in order to show whom the aggressor was in the conflict. Evidence of prior specific acts of the victim against a third party is inadmissible for this purpose. When evidence of a victim's dangerous character is offered to explain the defendant's reasonable apprehension of danger, evidence of specific acts may be introduced to show the accused's state of mind only if it is shown that the accused knew of the victim's reputation at the time of the offense. *Adams*, 2017 WL 6629300 at *7.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. A trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. *State v. Curtin*, 2022-1110 (La. App. 1st Cir. 10/5/23), 376 So.3d 918, 930, writ denied, 2023-01464 (La. 4/23/24), 383 So.3d 603.

The defendant first claims the trial court limited her cross-examination of Brandon Tate, Couch's childhood best friend, by not allowing her to present character evidence to rebut his testimony. During the State's case-in-chief, it inquired as to Couch's interactions with his children, to which Tate testified Couch

13

was a "very hands-on dad." The State then asked whether Tate had ever seen Couch act violently towards the baby, to which Tate responded negatively, stating Couch was "very gentle with children." Defense counsel objected and argued Tate opened the door to evidence of Couch's peaceful character, such that he should be allowed to cross-examine Tate about Couch's reputation and specific bad acts. The trial court overruled the objection but ruled defense counsel could ask Tate about any of Couch's bad acts towards his children. Defense counsel objected to the trial court's ruling and moved for a mistrial, which was denied by the trial court.

Upon review, because defense counsel failed to proffer the substance of what Tate's testimony would have been, we are unable to determine whether the trial court's limitation constitutes reversible error. See *State v. Brooks*, 98-1151 (La. App. 1st Cir. 4/15/99), 734 So.2d 1232, 1241, writ denied, 99-1462 (La. 11/12/99), 749 So.2d 651. Only matters contained in the record can be reviewed on appeal. *State v. Lavy*, 2013-1025 (La. App. 1st Cir. 3/11/14), 142 So.3d 1000, 1007, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150. To preserve the right to appeal a trial court's ruling that excludes evidence, the defendant must make the substance of the evidence known to the trial court. See La. C.E. art. 103(A)(2). Without the substance of the proffered evidence, this court cannot determine its admissibility and probative value. *Brooks*, 734 So.2d at 1241. Because the defendant failed to make a proffer, we are unable to say whether the error was harmless.

The defendant further alleges the trial court limited her cross-examination of Copeland by not allowing her to present character evidence under La. C.E. art. 404(A)(2) rebutting Copeland's testimony that Couch was not a violent person.

Copeland testified in the State's case-in-chief after Tate. The State asked Copeland her opinion as to whether the defendant needed to do certain things on the night of the shooting. Specifically, the State asked Copeland if the defendant needed to pull the trigger on the night of the shooting.[7] Copeland responded, "No. [Couch] wasn't a violent person. It just shouldn't have happened at all."

Prior to her cross-examination of Copeland, the defendant argued that because Copeland commented on Couch's nonviolent character, she should be allowed to present evidence of a domestic abuse protective order against Couch, Couch's criminal record, and police reports involving Couch. The State argued Copeland's response was unsolicited and nonresponsive and further argued any prior arrests, convictions, or police reports were irrelevant and inadmissible under Article 404(A)(2).

The trial court found the evidence inadmissible under either Article 404(A)(2) or 404(B) but noted that while the State did not elicit Copeland's testimony, she nevertheless stated Couch was not violent. Thus, the trial court ruled the defendant could cross-examine Copeland on whether her testimony was accurate and whether she had knowledge of any prior violent acts by Couch. Regarding the protective order against Couch, the trial court found it did not allege "hands-on violence" by Couch and, as such, the defendant could only cross-examine Copeland about her knowledge of the protective order. However, if

---

[7] Prior to this question, the State also asked Copeland the following questions:

[THE STATE:] "Who introduced a gun into the house that night?"

[COPELAND:] "[The defendant] did."

[THE STATE:] "Did she need to introduce a gun into the house?"

[COPELAND:] "No."

[THE STATE:] "Did she need to pull out a gun that night?"

[COPELAND:] "No. There was never a reason for a gun to be involved at all."

15

Copeland denied knowledge, the defendant could not ask her about the allegations therein. The trial court further ruled the defendant could cross-examine Copeland about her knowledge of any charges against Couch.

On cross-examination, Copeland denied having knowledge of a protective order filed against Couch in 2015 by his ex-girlfriend, Jorden Decker, or any of the allegations therein. Although she testified that she went to the courthouse with Couch, she denied going into the courtroom or discussing the allegations with Couch. She further denied knowing about any criminal charges against Couch, stating the facts would not change her mind about Couch's nonviolent character. Thereafter, outside the presence of the jury, the defendant proffered evidence of arrest reports involving Couch, bills of information related to charges against Couch, and the protective order.[8]

Upon review, we find the trial court did not err in limiting the defendant's cross-examination of Copeland. While the State may have opened the door to issues of the victim's character,[9] the defendant was able to ask several questions of

---

[8] The arrest reports include charges for DWI, DWI (second offense), DWI (third offense), resisting an officer, disturbing the peace by intoxication, simple criminal damage to property, battery of a police officer, and violation of a restraining order (the same protective order discussed herein). With respect to the protective order, Couch's ex-girlfriend, Decker, alleged that on two separate occasions, Couch repeatedly knocked on her front door and refused to leave when asked to do so. Decker also described another incident in which she and Crouch got into an argument. Decker began packing his things, at which point Couch grabbed his gun and said, "[s]omeone's going to have to shoot me before I leave." Decker also stated Couch "has a temper when he drinks" and noted she was worried he might show up at her home with a gun.

[9] The State's inquiry as to whether the defendant needed to pull the trigger and Copeland's response were both inappropriate for a number of reasons. Copeland's opinion as to whether the defendant "needed" to pull the trigger was arguably opinion testimony of a lay witness, as the defendant's state of mind is not a fact within Copeland's knowledge. Further, whether the defendant needed to pull the trigger was a question for the jury, as it goes to the ultimate issue of the case, i.e., whether the defendant reasonably acted in self-defense or defense of others. See *State v. Alexander*, 430 So.2d 621, 623-24 (La. 1983); *State v. Anderson*, 333 So.2d 919, 921 (La. 1976). As such, the State's questioning usurped the role of the jury in determining the merits of the defendant's defense. See *State v. Rushing*, 464 So.2d 268, 275 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *State v. Brister*, 2019-507 (La. App. 3d Cir. 3/20/20), 297 So.3d 992, 1009-10.
    Moreover, once Copeland testified that Couch was not a violent person, the State opened the door as to who was the aggressor and placed Couch's reputation for violence squarely at issue. At that point, the defendant was entitled to rebut this evidence under Article 404(A). See also La. C.E. arts. 405(B), 608(A) and (C), and 611(B); *St. Cyre*, 2019-0034 (La. App. 1st Cir.

16

this witness regarding her knowledge of the victim's prior bad acts. That the defendant found the witness's responses unsatisfactory does not mean the trial court's ruling was improper. The defendant was able to cross examine Copeland as to Couch's prior bad acts. Thus, the assignment of error is without merit.

## RIGHT TO CONFRONTATION

In her third assignment of error, the defendant argues the trial court violated her right of confrontation by impermissibly restricting her ability to impeach the testimony of Brandon Tate and Kristin Copeland.

In connection with the right to present a defense, a defendant also has the right to confront and cross-examine the State's witnesses. *Chambers v. Mississippi*, 410 U.S. 284, 294-95, 93 S.Ct. 1038, 1045-46, 35 L.Ed.2d 297 (1973); *Van Winkle*, 658 So.2d at 201-02. Cross-examination is the primary means by which to test the believability and truthfulness of testimony, and it provides an opportunity to impeach or discredit witnesses. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

A party may cross-examine a witness on any matter relevant to any issue in the case, including credibility. La. C.E. art. 611(B). Generally, to attack the credibility of a witness, a party may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony. La. C.E. art. 607(C). The admissibility of evidence under Article 607 is subject to the balancing test of Article 403, which states "[r]elevant ... evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

---

12/19/19), 292 So.3d 88, 110, writ denied, 2020-00142 (La. 5/26/20), 296 So.3d 106. Evidence of the victim's character for peacefulness is admissible by the State only in rebuttal, once the defendant has offered evidence that the victim was the aggressor. See La. C.E. art. 404(A)(2)(b). Herein, the State made Couch's character a central issue at the very outset of its case and before it was legally appropriate to do so. Once the State opened the door as to Couch's reputation for violence, or alleged lack thereof, the defendant was entitled to offer evidence of same.

undue delay or waste of time." See *State v. Morgan*, 2012-2060 (La. App. 1st Cir. 6/7/13), 119 So.3d 817, 829.

With respect to Brandon Tate, the defendant argues the trial court erred in not allowing her to impeach Tate's testimony regarding Couch's issues with alcohol, as well as his level of intoxication on the night of his death. On direct examination, the State asked Tate if he had ever seen Couch highly intoxicated and whether he had seen Couch "happy" drunk, "angry" drunk, or "sad" drunk. Tate responded he had observed Couch in all of these situations. Tate also testified that on the night of the shooting, Couch was not drunk but, rather, "regular" and "very coherent."

On cross-examination, the defendant asked whether alcohol caused a problem in Couch's life. The State objected, arguing the question was overly vague and ambiguous and that the trial court had not yet ruled on the admissibility of Couch's charge for driving while intoxicated (DWI), which was pending at the time of his death. The defendant noted the State already referenced Couch's DWI charge and his incarceration multiple times. The trial court ruled the defendant could ask Tate whether alcohol caused problems in Couch's life and about Couch's DWI charge. However, the trial court would not allow questions on whether Tate knew if alcohol affected Couch's relationships or whether Couch was ever accused of getting into altercations with women while intoxicated. Defense counsel then moved on to another proposed line of questioning regarding Tate's relationship with Copeland.

Based on the record, we find defense counsel acquiesced in the trial court's ruling sustaining the State's objection, and the objection was waived under La. C.Cr.P. art. 841(A). See *State v. Huizar*, 414 So.2d 741, 749 (La. 1982); *State v. Germany*, 2021-1614 (La. App. 1st Cir. 9/26/22), 353 So.3d 804, 816, writ denied,

18

2022-01568 (La. 1/11/23), 352 So.3d 983 (defense counsel acquiesced in ruling sustaining State's objection limiting examination of witness, where counsel failed to object to ruling). Defense counsel did not object to the trial court's ruling limiting his cross-examination of Tate. Instead, after the trial court's ruling, he discussed a different proposed line of questioning. Defense counsel also failed to proffer Tate's supposed testimony and, upon resuming cross-examination, proceeded along a different line of questioning. Accordingly, we find the defendant failed to preserve this issue for review on appeal.

As to Copeland, the defendant also sought to impeach her testimony that Couch was not a violent person by using extrinsic evidence of Couch's protective order and prior criminal arrests. Generally, extrinsic evidence contradicting a witness's testimony is admissible when offered solely to attack the credibility of a witness. La. C.E. art. 607(D)(2). Such evidence is admissible after the proponent has first fairly directed the witness's attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so. See La. C.E. art. 613. However, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. La. C.E. art. 602.

Under these particular circumstances, we are constrained to find the trial court did not err in excluding the proffered evidence and limiting the defendant's impeachment of Copeland. When asked by the defendant, Copeland specifically denied having personal knowledge of the protective order or any criminal charges against Couch, and the record contains no evidence that Copeland was aware of same. Although the protective order alleged shockingly similar facts as those established in the instant case, Copeland was not the victim involved in that matter. Further, Copeland was not present during any of Couch's arrests or incidents with

19

police. In order to conclude the evidence was admissible to impeach Copeland, this court would be engaging in pure speculation that Copeland was in fact aware of the information contained therein. Thus, the defendant did not lay a proper foundation to attack Copeland's credibility with this evidence, and the trial court correctly excluded it. See La. C.E. arts. 602 and 613. Accordingly, this assignment of error is without merit.

## MOTION IN LIMINE

In her fourth assignment of error, the defendant argues the trial court erroneously denied her motion in limine and admitted prejudicial, irrelevant evidence under La. C.E. art. 404(B).

Evidence of a defendant's other crimes, wrongs, or acts is generally inadmissible because of the substantial risk of grave prejudice to the defendant. It is well settled courts may not admit evidence of other acts to show the defendant as a woman of bad character who has acted in conformity with her bad character. La. C.E. art. 404(A); *Curtin*, 376 So.3d at 929. However, evidence of other acts may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1)(a). The State bears the burden of proving the defendant committed the other acts. Even when the evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. Thus, this type of evidence is still subject to the balancing test under Article 403, and this court will not overturn the trial court's determination absent a clear abuse of discretion. See *Curtin*, 376 So.3d at 929-30.

20

Prior to trial, the defendant filed a motion in limine to exclude testimony by Copeland regarding a single sexual encounter between Copeland and the defendant which occurred over four years prior to Couch's death. At the hearing on the motion, the defendant argued the evidence was irrelevant, prejudicial, and not probative of the issue of self-defense. The defendant further argued the evidence was only offered to smear her character, not to prove motive. In response, the State noted the prejudicial effect was nonexistent, as homosexuality and bisexuality were no longer taboo, illegal, or immoral. Thus, the State argued the evidence was relevant to show motive or premeditation if the defendant had romantic feelings for Copeland, which may have influenced how the defendant reacted on the night of the shooting.

Although the trial court noted it was a close call, it ruled the testimony was admissible on the issue of motive and found the prejudicial effect of the evidence to be low because people in the present are not as "down on homosexual relationships" as they were in the past. The defendant noted her objection

At trial, Copeland testified she and the defendant "slept together" one time when they first met and remained just friends thereafter. The defendant's husband, Joshua Stockstill, testified that when he returned home from work on a prior birthday, Copeland and the defendant attempted to engage in sexual relations with him. Stockstill stated that although he touched Copeland a little bit, Copeland and the defendant did not touch each other sexually. The defendant also stated there was no sexual contact between her and Copeland, although some of their clothes were off.

It is possible the evidence of the relationship between these two women could have been viewed by a rational juror as evidence of a potential motive outside of self-defense, and because the evidence elicited by the State was

21

relatively brief and did not play a key role in its prosecution of the defendant, we find no abuse of discretion in the trial court's admission of this evidence.[10] Accordingly, this assignment of error is without merit.

## PATENT ERROR

Pursuant to La. C.Cr.P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. *State v. Anthony*, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. After a careful review of the record, we have found one patent error.

After the trial court imposed the sentence herein, it failed to advise the defendant of the applicable time period to file an application for post-conviction relief. Louisiana Code of Criminal Procedure article 930.8(C) provides that at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for applying for post-conviction relief. Its failure to do so, however, has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. Further, Article 930.8 does not provide a remedy for an individual defendant who is not told of the limitations period. *State v. LeBoeuf*, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142-43, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158.

Out of an abundance of caution and in the interest of judicial economy, we instead advise the defendant that Article 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of

---

[10] The defendant complains on appeal the State exploited the testimony regarding the sexual encounter in its closing argument when it specifically stated the defendant's actions "were the product of [the defendant's] unrequited romantic obsession with [Copeland]." However, no such statement is contained within the State's closing argument.

22

conviction and sentence have become final under the provisions of La. C.Cr.P. arts. 914 or 922. *LeBoeuf*, 943 So.2 at 1143.

## DECREE

For these reasons, the conviction and sentence of the defendant, Margaret Camaille Stockstill, is affirmed.

**AFFIRMED.**